# EXHIBIT B

CONFIDENTIAL

Page 1

1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
2                      EASTERN DIVISION

3

4    CATHERINE HENRY,                )
                                     )
5          Plaintiff,                )
                                     )
6       -vs-                         )   NO. 20 C 6353
                                     )
7    CHEFS' WAREHOUSE/ALLEN          )
     BROTHERS,                       )
8                                    )
            Defendant.               )

9

10

11            "C O N F I D E N T I A L"

12                 SECTION IV

13

14        Remote videoconference deposition of

15   CHRISTOPHER PAPPAS taken before TRUDY G. GORDON, a

16   Certified Shorthand Reporter, pursuant to the Federal

17   Rules of Civil Procedure for the United States

18   District Courts, pertaining to the taking of

19   depositions, commencing at 8:30 a.m. on the 15th day

20   of July, A.D., 2021.

21

22

23

24

CONFIDENTIAL

Page 2

1 REMOTE APPEARANCES:
2    LAW OFFICES OF MELISSA REARDON HENRY
3    3630 North Avers Avenue
4    Chicago, Illinois  60618
5    773-914-9090
6    BY: MS. MELISSA REARDON HENRY
7       melissareardonhenry@gmail.com
8
         appeared on behalf of the Plaintiff;
9
10
      MORGAN, LEWIS & BOCKIUS, LLP
11
      77 West Wacker Drive
12
      Suite 500
13
      Chicago, Illinois  60601-5094
14
      312-324-1789
15
      BY: MR. JAMES P. LOOBY
16
         james.looby@morganlewis.com
17
18       appeared on behalf of the Defendant.
19
20
21 ALSO PRESENT: MICHAEL ALEXANDER - THE VIDEOGRAPHER
22
23 REPORTED BY: TRUDY G. GORDON, C.S.R.
24       CERTIFICATE NO. 084-004077

Page 3

1       I N D E X
2 WITNESS                    PAGE
3 CHRISTOPHER PAPPAS
4 EXAMINATION BY MR. HENRY.....................   5
5
       E X H I B I T S
6
7 DEPOSITION EXHIBITS    DESCRIPTION        PAGE
8 EXHIBIT NO. 1    DEFENDANTS' ANSWER AND    20
       DEFENSES TO PLAINTIFF'S
9       COMPLAINT
10 EXHIBIT NO. 2    3-9-2016 LETTER    30
       FROM CHRISTOPHER PAPPAS
11
      EXHIBIT NO. 3    JOB DESCRIPTION    40
12
      EXHIBIT NO. 4    INSIDER TRADING POLICY   105
13       (EX. 8 TO C. HENRY'S DEP)
14 EXHIBIT NO. 5    EXTENSION OF POLICY ON    106
       INSIDER TRADING
15
      EXHIBIT NO. 6    E-MAIL 3-4-2019    137
16       FROM PAT LECOURAS
17 EXHIBIT NO. 7    E-MAIL 3-4-2019    140
       FROM JIM LEDDY
18
19
20
21 ******* EXHIBIT 4 IS ALSO IN TRANSCRIPT AS *******
22    EXHIBIT 8. ONLY EXHIBIT #4 SHOULD BE ATTACHED
23
24

Page 4

1    THE VIDEOGRAPHER:  We're now on the record.
2 Today's date is July 15, 2021, and the time on the
3 monitor is 8:47 a.m.  This is the remote video
4 deposition of Chris Pappas in the matter of Catherine
5 Henry versus Chefs' Warehouse/Allen Brothers, filed
6 in the United States District Court for the Northern
7 District of Illinois, Eastern Division.  Case Number
8 20 C 6353.  The court reporter is Trudy Gordon, and I
9 am the videographer, Michael Alexander, both with
10 Veritext Midwest.
11    Beginning with the taking attorney, Counsel and
12 all present, please state your affiliations and
13 appearances for the record.
14    MS. HENRY:  Good morning.  This is Melissa
15 Reardon Henry on behalf of the Plaintiff, Catherine
16 Henry.
17    MR. LOOBY:  Good morning, everyone.  This is
18 James Looby of Morgan, Lewis, on behalf of the
19 Defendant.
20    THE VIDEOGRAPHER:  Would the court reporter
21 please swear in the witness
22       (WHEREUPON, THE WITNESS WAS DULY
23        SWORN.)
24    THE VIDEOGRAPHER:  Thank you.  You may proceed.

Page 5

1    MS. HENRY:  Thank you.
2       Good morning, Mr. Pappas.
3    THE WITNESS:  Morning.
4    MS. HENRY:  How are you today?
5    THE WITNESS:  I'm doing great.  Thank you.
6    MS. HENRY:  Good.  So my name is Melissa Reardon
7 Henry.  I'm an attorney who's been retained by
8 Catherine Henry for the purpose of suing Chefs'
9 Warehouse.
10       Would you kindly state and spell your name
11 for record.
12    THE WITNESS:  Christopher Pappas.  Last name is
13 P, as in Peter, A-P-P-A-S.
14    MS. HENRY:  Thank you, Mr. Pappas.
15       Before I begin asking you questions, I'd
16 like to go over some deposition rules.
17       CHRISTOPHER PAPPAS,
18 called as a witness herein, having been first duly
19 sworn, was examined and testified as follows:
20       EXAMINATION
21 BY MR. HENRY:
22    Q.  Have you ever had your deposition taken
23 before?
24    A.  Yes.

2 (Pages 2 - 5)

CONFIDENTIAL

Page 6

1    Q.   So you are -- You are aware today that
2  this deposition is being recorded by both video and
3  audio and that there's also a court reporter taking
4  down your testimony?  Are you aware of that?
5    A.   Yes.
6    Q.   So I would like to remind you that because
7  the court reporter is -- is transcribing your
8  responses, all of your responses need to be oral.
9         Do you understand that?
10    A.   Yes.
11    Q.   So no nodding and no uh-huh.
12         Is that okay?
13    A.   I will try my best not to uh-huh, yes.
14    Q.   Okay.  And it will make for a clean record
15  and a happy day for Ms. Gordon if we don't talk over
16  one another.
17    A.   Got it.
18    Q.   If I ask you a question and you answer it,
19  I will assume you've understood the question.
20         Is that okay?
21    A.   That's -- That's fine.
22    Q.   And if you need clarification on a
23  question, please ask and I will repeat or rephrase
24  the question.

Page 7

1         Is that understood?
2    A.   Understood.
3    Q.   If you need to take a break, please let me
4  know and we can arrange that.  But please don't ask
5  for a break while there is a question pending.
6         Do you understand?
7    A.   Understand.
8    Q.   And your attorney objects to questions.
9  But you're still obliged to answer.
10         Do you understand that instruction?
11    A.   I'm sorry.  I did not hear that.
12    Q.   In the event that your attorney objects to
13  the form of a question or to the way I have phrased a
14  question, you still have an obligation to answer.
15         Do you understand that?
16    A.   Yes.
17    Q.   Mr. Pappas, are you suffering from any
18  condition or illness today that would impair your
19  ability to testify?
20    A.   No.
21    Q.   Do you have any diagnosis that would
22  indicate your memory has been impaired?
23    A.   No.
24    Q.   Do you have any reason to believe that

Page 8

1  your memory might be impaired otherwise?
2    A.   No.
3    Q.   Have you taken any substances that would
4  affect your ability to testify truthfully and
5  accurately?
6    A.   No.
7    Q.   Mr. Pappas, have you ever been convicted
8  of a crime?
9    A.   No.
10    Q.   Have you been a defendant in a lawsuit
11  before?
12    A.   No.
13    Q.   Have you ever been charged civilly with
14  discrimination?
15    A.   No.
16    Q.   Can you tell me about the time that you've
17  had your deposition taken in the past?
18    A.   It was a incident with a company we bought
19  in California and it had to do with one of the
20  managers who they fired.
21    Q.   And were there allegations against you in
22  that incident?
23    A.   It was -- It was a case over -- I think it
24  was a case over severance.

Page 9

1    Q.   Do you recall the name of the employee?
2    A.   No.
3    Q.   Do you recall the outcome of the case?
4    A.   Not exactly.
5    Q.   Well, how about inexactly?
6    MR. LOOBY:  Objection.  Form.
7  BY THE WITNESS:
8    A.   I know -- I know I gave my deposition.  It
9  was a very -- I mean, it was not a significant
10  amount, so I -- I just -- I mean, I -- I do run a $2
11  billion company and, you know, the numbers start --
12  every day is something, so we do our best to remember
13  everything.  But it was not something of significance
14  that would be on my radar.
15  BY MS. HENRY:
16    Q.   How did you prepare for your deposition
17  today, Mr. Pappas?
18    A.   I did a prep yesterday of things that I
19  should be aware of and, you know, just to update my
20  memory and, that's about it.
21    Q.   Can you tell us about your educational
22  background, Mr. Pappas?
23    A.   I have a college degree from many years
24  ago.  I had a scholarship at Adelphi University, and

3 (Pages 6 - 9)

CONFIDENTIAL

Page 10

1  I started Chefs' Warehouse in 1985 with basically a
2  mortgage on my dad's house, and since then I've been
3  running the company and growing it.
4      Q.   Have you ever been employed by any
5  employer or entity other Chefs' Warehouse?
6      A.   Besides playing professional basketball in
7  Europe, you know, I must have had, you know -- I must
8  have had jobs during college on and off.  But since
9  1985 I've been building Chefs' Warehouse.
10     Q.   And what is your current position.
11     A.   I am president and CEO.
12     Q.   And how long have you held the title
13 president and CEO of Chefs' Warehouse?
14     A.   Over 35 years.
15     Q.   Do you know my client, Catherine Henry?
16     A.   Yes, I do.
17     Q.   How do you know her?
18     A.   She was one of our highest ranking
19 managers in our company.  I was part of the hiring
20 process when they hired Ms. Henry.  And I worked very
21 closely with her during the early years of trying to
22 build-out our Chicago businesses.
23     Q.   When you say that you were part of the
24 hiring process, how did you come to be part of a

Page 11

1  hiring process to hire Catherine Henry for Chefs'
2  Warehouse?
3      A.   Any executive that's hired usually goes
4  through multiple rounds of interviews.  So I was
5  asked to interview her in part of that process.
6      Q.   Who asked you to interview her?
7      A.   Probably Human Resources, and at the time
8  the Vice President of Operations who -- who
9  eventually hired her and she reported to him.
10     Q.   What's his name?
11     A.   Tyler Hawes.
12     Q.   How did you first learn about Catherine
13 Henry?
14     A.   I'm sorry?
15     Q.   How did you first learn of Catherine
16 Henry?
17     A.   Through Tyler Hawes.
18     Q.   Do you know how Tyler Hawes became
19 familiar with her?
20     A.   I think they were doing a search looking
21 to hire qualified executives.
22     Q.   Do you know anything about her reputation
23 in the industry?
24     A.   I knew she she had great success in sales

Page 12

1  in -- in Chicago, and I gather she got promoted and
2  moved to Wisconsin and had a good career in Cisco in
3  Wisconsin.
4      Q.   Did you select Catherine Henry for the --
5  for her role at Chefs' Warehouse?
6      A.   I didn't select her personally.  But like
7  I said, I was part of the process, and I found her to
8  be a good candidate, and I think they had three --
9  you know, they cut the process down to about 3 people
10 out of maybe 15 that they were interviewing, and I
11 said I was fine with all 3 candidates.
12     Q.   Did you participate in the final -- final
13 round of interviews for Catherine Henry?
14     A.   I must have.
15     Q.   Do you have a specific recollection of
16 participating in the final round of interviews for
17 Catherine Henry?
18     A.   I have a -- I have a memory that I thought
19 she was a very solid choice.  I thought she could do
20 the job.  I was very impressed with her knowledge of
21 the business.  I thought that she understood what we
22 were trying to accomplish and was up for the
23 challenge.  And I thought she was a very good choice.
24     Q.   And do you know whether or not Catherine

Page 13

1  Henry received an offer of employment subsequent to
2  the interview that you participated in?
3      A.   That I can't recall.
4      Q.   Do you recall whether Catherine Henry was
5  offered her position at the interview that you
6  participated in?
7      A.   I don't recall the complete process, but
8  obviously she was offered the job and she accepted
9  it, and she was an employee of Chefs' Warehouse.
10     THE VIDEOGRAPHER:  Excuse me.  There's a Galina
11 Petrosian wants to get in.  Is that okay to admit
12 her?
13     MR. LOOBY:  Yes.  It's in-house counsel.
14     THE VIDEOGRAPHER:  Okay.  Thank you.  Sorry to
15 interrupt.
16 BY MS. HENRY:
17     Q.   Do you know whether or not Catherine Henry
18 was onboarded to her position as Chefs' Warehouse?
19     A.   I don't think I understand that question.
20 Everybody is usually onboarded into a position.
21     Q.   Do -- Does Chefs' Warehouse have a formal
22 onboarding procedure for new employees?
23     A.   We have an onboarding process.
24     Q.   And what does that process entail?

4 (Pages 10 - 13)

CONFIDENTIAL

Page 14

1  A. Every position is different. Every --
2 Every region does it, you know, a different way. I'm
3 not exactly sure of the complete process.
4  Q. When you described the role that Catherine
5 Henry was hired to, you described it as a very high
6 level position.
7  What was her title?
8  A. I believe it was an Executive Vice
9 President.
10  Q. And what would your -- Do you have a
11 belief as to how an Executive Vice President at
12 Chefs' Warehouse would be onboarded to that role?
13  A. Well, I imagine that they are -- are
14 introduced to the team. Management spends time with
15 them introducing them to the people that they will be
16 managing. They go through a whole HR process of our
17 employee handbooks and our policies and our processes
18 and -- You know, it's -- it's constant. It's not
19 just, you know, half a day and, you know, everything,
20 you know, about our 50,000 products and our thousands
21 of employees. So it's an ongoing process. We run
22 it -- You know there's -- There's processes we run,
23 I'm sure, monthly, and I know yearly. There's
24 constant training. And I think it's a continuing

Page 15

1 process.
2  Q. Do you know whether, in fact, Cathy Henry
3 went through the type of onboarding process that you
4 just described imagining would have occurred?
5  MR. LOOBY: Objection to the form of the
6 question.
7  MS. HENRY: I likewise object, James.
8  Would you read it back court reporter. It
9 was a little convoluted.
10  (WHEREUPON, THE RECORD WAS READ
11  AS REQUESTED.)
12 BY MS. HENRY:
13  Q. So you described an onboarding --
14  I'm going to rephrase it.
15  So you described an onboarding process
16 that you would imagine would occur for an Executive
17 Vice President; is that right?
18  A. Correct.
19  Q. Do you know whether or not Catherine Henry
20 went through an onboarding process like that which
21 you've described?
22  A. Yeah, I know that Tyler Hawes, which was
23 her manager, spent a lot of time with Ms. Henry. And
24 I personally spent a lot of time out in Chicago. It

Page 16

1 was a new territory. It was important for me to
2 understand the territory and the players. And, you
3 know, the day-to-day minute granular details, no, I'm
4 not part of you.
5  Q. Do you -- To whom did Cathy Henry report
6 when she was first hired?
7  A. Yeah, I believe she reported to Mr. Pat
8 O'Callaghan.
9  Q. How long do you believe Catherine Henry
10 reported to Pat O'Callaghan?
11  A. I would say at least a year.
12  Q. And was that -- Do you believe that she --
13 When do you believe Catherine Henry was hired at
14 Chefs' Warehouse?
15  A. When do I believe she was hired?
16  Q. Yes.
17  A. I believe it was 2015.
18  Q. So you believe that Catherine Henry
19 reported to Pat O'Callaghan in 2015?
20  A. No. When she was hired, she -- When she
21 was hired, she reported to Mr. Tyler Hawes.
22  Q. Okay. Do you know how long Catherine
23 reported to Tyler Hawes?
24  A. I would say at least two years.

Page 17

1  Q. Do you know when -- why Catherine Henry
2 would have stopped reporting to Tyler Hawes?
3  A. Yeah. Tyler took a -- became Chief
4 Operating Officer of Roland Foods and left the
5 company.
6  Q. Who did Catherine Henry report to after
7 she reported to Tyler Hawes?
8  A. Yeah, for a while I -- I was interim. I
9 took it over for a while until I could reorganize our
10 Management Team. So she reported to me.
11  Q. For how long did she report to you?
12  A. I would say a year or two.
13  Q. Who did Catherine Henry report to after
14 the year or two that she reported to you?
15  A. I would say it had to be Mr. Pat
16 O'Callaghan.
17  Q. So is it your testimony then that -- that
18 she reported to Pat O'Callaghan from the time that
19 she stopped reporting to you?
20  A. I believe so.
21  Q. Until when? What do you believe?
22  A. I believe she reported to Pat O'Callaghan
23 until she left the company.
24  Q. Okay. Who is Steve Kane?

5 (Pages 14 - 17)

CONFIDENTIAL

Page 18

1    A.   Steve Kane was -- He was an executive that
2  joined us from Cisco that was here for a very short
3  period of time.
4    Q.   Did Catherine Henry report to Steve Kane?
5    A.   That's possible.  I'm -- I'm not a hundred
6  percent sure.  But -- Because he was here for such --
7  such a short period of time.  He took a position out
8  in the Rockies, I believe, as a President.  So he was
9  not here for a very long time.  So I don't have a lot
10  of recall of his tenure.
11    Q.   Do you believe that Catherine reported to
12  Pat O'Callaghan after she reported to you without any
13  interruption?
14    MR. LOOBY:  Objection.  Asked and answered.
15    MS. HENRY:  You can answer the question, sir.
16  BY THE WITNESS:
17    A.   Yeah, she might have reported to Steve
18  Kane while he was here before -- I don't -- I don't
19  recall the exact sequences.  But I'm trying to recall
20  because Steve was here for such a short period of
21  time, and what his exact responsibilities were.  But
22  there is a good possibility she reported at some
23  period to Steve Kane before she reported to Pat
24  O'Callaghan.

Page 19

1  BY MS. HENRY:
2    Q.   During the time that Catherine Henry
3  reported to you, how would you describe your working
4  relationship with her?
5    A.   I thought it was great.  I was -- You
6  know, I continued to be very fond of Cathy Henry.  I
7  thought we had a very good relationship.  It was a
8  tough period.  We had acquired multiple companies.
9  So there was many, many, many headwinds to overcome.
10  There was a pretty good -- It was a tight team.
11  There was Ellie Thomas who at the time was Executive
12  Vice President as well, Director of Operations.  So
13  it was kind of a bifurcated org structure where we
14  had Sales and we had Operations and we were working
15  as a team.
16    Q.   So Ellie Thomas you said is the Executive
17  Vice President of Operations?
18    A.   Correct.
19    Q.   And when you say a bifurcated structure,
20  who was that bifurcated among, Ellie and you or whom?
21    A.   Yes.  So, again, it was a pretty tight --
22  still continues to be a pretty tight team.  We break
23  up the responsibilities for expertise.  So there's
24  direct lines and dotted lines.  So Ellie Thomas had a

Page 20

1  direct line into all our regions' operating
2  executives, and put her expertise in Operations
3  with -- until I filled -- backfilled when Tyler Hawes
4  left, and then we broke up the -- the structure, and
5  it was Ellie Thomas, and then it was the Regional
6  Executive Vice Presidents.
7    Q.   When you first hired Catherine Henry, what
8  was your understanding of her role?
9    A.   She was hired, if I recall correctly, to
10  really, you know, help us build Chicago, you know,
11  and the whole Illinois territory.
12    Q.   What do you understand Catherine Henry has
13  alleged in this lawsuit?
14    A.   That we discriminate against women.
15    Q.   Do you have any more specific
16  understanding of her allegation of discrimination?
17    A.   No.
18    Q.   Okay.  Mr. Pappas, I have introduced an
19  exhibit that I have marked Exhibit 1.
20    Do you have the capacity to review
21  Exhibit 1?
22    A.   There's nothing on my screen.
23    MR. LOOBY:  Melissa, he may not have Exhibit
24  Share set up.  I've asked Veritext to send him the

Page 21

1  information.  I'm not sure to the extent that
2  happened.  So you may need to share your screen.
3    THE WITNESS:  Sent to me this morning?
4    MR. LOOBY:  It would have been sent a couple
5  days ago.
6    THE WITNESS:  And who sent it to me so I could
7  search it?
8    MR. LOOBY:  It would have been Veritext.
9    THE WITNESS:  I'm sorry?
10    MR. LOOBY:  Veritext, V-E-R-I-T-E-X-T-.  I'm not
11  sure if it would have come from a specific person or
12  their general e-mail address.
13    THE WITNESS:  Okay.  It was just posted on my
14  screen.
15    MR. LOOBY:  Well, if you want to take a look
16  now, Melissa is sharing her screen so you can look at
17  the exhibit here, and then just direct her up and
18  down as you need to see it or she needs to direct you
19  to it.
20  BY MS. HENRY:
21    Q.   So, Mr. Pappas, you can see what I have
22  shared on the screen, and I have -- I haven't shared
23  it with the exhibit marker though because I shared it
24  from a PDF.

6 (Pages 18 - 21)

CONFIDENTIAL

Page 22

1        Counsel, does that matter to you?  Do you
2   want me to go back in and get the one that is marked
3   as an exhibit or are you comfortable that --
4        MR. LOOBY:  I'm comfortable with this one as
5   long as we're clear on the record when you're showing
6   one that has the exhibit sticker or not.  I see the
7   one you've introduced, so it's not a problem.
8        MS. HENRY:  Court Reporter, is that okay with
9   you?
10        THE REPORTER:  Yes.
11        MS. HENRY:  Thank you, Madam Court Reporter.
12   Okay.
13        Because I -- That's the -- That's the bit
14   of the technology that I haven't -- I didn't
15   practice, entering an exhibit once it was marked, so
16   okay.
17   BY MS. HENRY:
18        Q.   Mr. Pappas, you can see a document on your
19   screen, and I would -- I would like you to take a
20   moment to review it.  I'm going to direct you to --
21   direct you to particular paragraphs, but I wanted to
22   give you an opportunity to look at the whole thing.
23   So tell me when to begin to scroll.
24        A.   I'm ready.

Page 23

1        Q.   Okay.  Have you had an opportunity to
2   review this document at least as far as I have
3   scrolled through it?
4        A.   Well, it went pretty fast.  I'm not sure I
5   caught all of it.  But I'm pretty familiar with most
6   of these points.
7        MR. LOOBY:  Just for the -- Sorry, Melissa.
8   Just for the record, you scrolled up to the end of
9   Page 5 of the exhibit.
10        MS. HENRY:  Yes, I did, of Exhibit 1, which I
11   will represent is the Defendant's answer to the
12   lawsuit that Ms. Henry has filed.
13   BY MS. HENRY:
14        Q.   So I'm going to ask you this morning just
15   about the Defendant's answer -- First of all, have
16   you seen this Exhibit 1 before, Mr. Pappas?
17        A.   I'm not a hundred percent sure.  I looked
18   at a lot of documents.  But I'm not a hundred percent
19   sure I read all of this.
20        Q.   Do you know whether or not you had an
21   opportunity to review the answer that your company
22   filed in this case before it was filed?
23        A.   I'm not a hundred percent sure.
24        Q.   I'll direct your attention, if I may,

Page 24

1   please, to Paragraph 14.  Defendants admit the
2   allegation that Catherine Henry is the -- was the
3   only Regional Vice President at Chefs' Warehouse.
4        Is this consistent with your recollection?
5        MR. LOOBY:  I'm going to object to the form.
6        But you can go ahead.
7   BY THE WITNESS:
8        A.   Yeah.  We only have a few Executive Vice
9   Presidents.  I know that Tina Roberts was Regional
10   Vice President.  Ellie Thomas was Executive Vice
11   President of all operations.  So I'm not seeing where
12   this is going.  But, you know, Pat Lecouras is head
13   -- is one of our top four executives in the company.
14   So I always thought we did a great job trying to find
15   really qualified women in an industry that does not
16   have a lot of women executives, and I was very proud
17   about that.  So I'm not exactly sure where this is
18   going.
19   BY MS. HENRY:
20        Q.   So is it your testimony that your answer
21   to the allegation at Paragraph 14 is not true?
22        MR. LOOBY:  I'm going to object to the form of
23   this.
24        MS. HENRY:  You can answer.

Page 25

1        THE WITNESS:  Yeah.
2   BY THE WITNESS:
3        A.   Again, time and place over the years,
4   people come and go.  But I know when I look in my org
5   chart Tina Roberts was an Executive Vice President
6   and Regional Vice President of Southern California,
7   so I don't see how that would be true unless there
8   was an overlap of time.
9   BY MS. HENRY:
10        Q.   Okay.  Are you using the terms Executive
11   Vice President and Regional Vice President
12   interchangeably?
13        A.   No, it's the same job.  It's the same job
14   that -- No, Executive Vice President would have a
15   region or a particular area and have more
16   responsibilities with the P&L.
17        MR. LOOBY:  Melissa, can I ask -- just get one
18   clarification on this one here.  When you're using
19   the phrase Chefs' Warehouse, are you referring to the
20   parent company and all its subsidiaries or are you
21   referring to a specific entity given that there a
22   number of subsidiaries on the company.  So it may
23   help the witness if you're specific as to that
24   particular point.

7 (Pages 22 - 25)

CONFIDENTIAL

Page 26

1 MS. HENRY: I'm referring to the specific
2 entities that Catherine Henry has sued and the entity
3 over which Chris Pappas serves as the President and
4 CEO.
5 MR. LOOBY: Well, those are different.
6 MS. HENRY: Okay. Well, let's let the witness
7 answer from his perspective in the capacity in which
8 you have presented him as a witness today.
9 BY THE WITNESS:
10 A. Well, I oversee all our companies. It's
11 an umbrella of over 30-something different
12 businesses. So, again, the way our company is broken
13 up, it's -- it's kind of bifurcated. Some are more
14 specific to production facilities, and others are
15 specialty food distribution businesses. Cathy Henry
16 was employed by Chefs' Warehouse. I'm assuming she
17 was Chefs' Warehouse Midwest. And Tina Roberts was
18 Chefs' Warehouse Southern California. And Ellie
19 Thomas was Chefs' Warehouse North America.
20 BY MS. HENRY:
21 Q. And you're using the verb was.
22 Does Ellie Thomas still work for Chefs'
23 Warehouse?
24 A. She retired.

Page 27

1 Q. Does -- When did she retire?
2 A. A year ago, I believe. And she moved to
3 South Carolina.
4 Q. What about Tina Robertson -- Was it Tina
5 Robertson or Tina Roberts?
6 A. Tina Roberts -- Tina Roberts had a very --
7 very -- Her spouse had a sudden heart attack and
8 died, and she's -- she's left the company to take
9 care of the estate.
10 Q. When did that happen?
11 A. It was during Covid. So the past six
12 months.
13 Q. So turning your attention to Paragraph 15.
14 Catherine Henry consistently exceeded performance
15 expectations. And if you review Exhibit 1, you could
16 see that the Defendants denied the allegation in
17 Paragraph 15 of the Complaint.
18 Is it true that Catherine Henry did not
19 consistently exceed performance expectations?
20 A. You know that I'm -- I'm not familiar
21 with. Again, I had a very good relationship and
22 thought very fondly of Cathy Henry. She was not let
23 go for performance. She was let go because she
24 violated a very, very serious policy that we had that

Page 28

1 I'm still very sad to see Ms. Henry leave the
2 organization. So that's as far as my knowledge goes.
3 Q. During the two different periods when
4 Cathy Henry reported to you, did she exceed your
5 expectations?
6 A. I was -- I was satisfied -- I was very
7 impressed with the effort. Again, it was a very
8 difficult time for the Midwest. A very challenging
9 time. We had gone through many trials and
10 tribulations with multiple acquisitions. I worked
11 very closely with Ms. Henry and, you know, I thought
12 we had a great relationship.
13 Q. Would you characterize what you have just
14 described as exceeding your expectations?
15 A. It was such a challenging time my
16 expectations, you know, like every CEO, is to
17 maximize profitability. That we never accomplished
18 for many reasons. But I was very satisfied with
19 her -- with her effort. I thought she worked very
20 hard, and she cared a lot about her job and the
21 company.
22 MS. HENRY: All right. I'm going to mark an
23 exhibit and try to share it on my screen once I've
24 marked it. So let's -- Give me -- With your

Page 29

1 permission, Counsel, and your forbearance, I will try
2 to get this right.
3 That doesn't share the whole document,
4 right? That just shares this little screen? There
5 we go.
6 Are you seeing a document on your screen,
7 James?
8 THE WITNESS: I can see the top of it.
9 MR. LOOBY: Yeah, I'm also trying to pull up the
10 exhibit that you marked just I can verify that it's
11 the same as the one you're showing.
12 MS. HENRY: Well, here, I -- This is the one --
13 I hope --
14 MR. LOOBY: Oh, that --
15 MS. HENRY: Yeah. I hope that I'm showing what
16 I have marked as an exhibit.
17 MR. LOOBY: Yeah, you are, Exhibit 2. Can you
18 just flip to the bottom. For some reason my Exhibit
19 Share is not loading what you just marked.
20 MS. HENRY: Is this what you mean by flip to the
21 bottom?
22 MR. LOOBY: Yeah, just so I can see the -- the
23 entire exhibit. Thank you.
24 MS. HENRY: Okay.

8 (Pages 26 - 29)

CONFIDENTIAL

Page 30

1    MR. LOOBY: Also, plus, Melissa, it may help if
2 you could Zoom out a little bit.
3    MS. HENRY: Yeah, I'm trying to figure out how
4 to do that.
5    MR. LOOBY: If you go to the left and just --
6 yeah, and hit that -- No, to the middle of the
7 screen. If you can just hit the Zoom out.
8    MS. HENRY: Is that better?
9    MR. LOOBY: Much better. Thank you.
10    MS. HENRY: You're welcome.
11 BY MS. HENRY:
12    Q. Okay. Again, Mr. Pappas, do you see what
13 is marked in yellow as Exhibit 2 on your screen?
14    A. Yes.
15    Q. Okay. I will once again scroll through
16 this document, and I'm asking you to review it as I
17 do so. Please tell me if you would like me to slow
18 down.
19        Have you had an opportunity to review what
20 I have marked as Exhibit 2, Mr. Pappas?
21    A. Yes.
22    Q. And what does it appear to be?
23    A. These are letters that I send out at the
24 end of -- end of the year to -- to people that have

Page 31

1 the P&Ls.
2    Q. What do you mean by P&L for the lay people
3 on the call?
4    A. Profited -- Profit and loss
5 responsibility.
6    Q. And so the -- Is this your handwriting on
7 the first page of Exhibit 2?
8    A. The really bad handwriting, yes, that's
9 mine.
10    Q. And is it customary for you to write this
11 kind of a note to an employee who is eligible for a
12 bonus?
13    A. I try to -- to touch as many as possible,
14 yes.
15    Q. And when you include this kind of a note,
16 and when you try to touch as many as possible, what's
17 the purpose behind that practice?
18    A. Just to show them that I'm acknowledging
19 their effort.
20    Q. So would an employee who was not meeting
21 or exceeding your expectations receive this kind of a
22 letter from you?
23    A. Yes, because obviously I'm trying to pep
24 them up for the coming year. You know, every year

Page 32

1 brings its own challenges. So, you know, sometimes
2 we have great years. Sometimes we don't have great
3 years. It's not a hundred percent. Sometimes it's
4 not people's fault, it's the market or a certain
5 thing. Again, I try to keep a relationship with the
6 leadership of the company. And I take a lot of
7 enjoyment in writing a few notes when I can at the
8 end of the year to recognize them.
9    Q. So is it a reflection of an employee's
10 performance if they receive this type of a note from
11 you?
12    MR. LOOBY: Objection to form.
13 BY THE WITNESS:
14    A. Yeah, all -- All, I think, RVPs, EVPs and
15 leaders, you know, get a letter. Anybody -- Anybody
16 in the bonus pool gets a letter.
17    MS. HENRY: Okay.
18 BY THE WITNESS:
19    A. So one way or the other they will get a
20 letter, whether it's a small bonus, no bonus, or a
21 full bonus. And I try to -- I try to write a note to
22 as many as possible.
23 BY MS. HENRY:
24    Q. So for the -- On the first page of

Page 33

1 Exhibit 2 you can see that it's dated March 9, 2016.
2        Is this -- Do you understand that this
3 would be -- have been the first year Cathy Henry was
4 eligible for a bonus at Chefs'?
5    A. I'm -- You're saying it was the first
6 year?
7    Q. Yes.
8    A. Okay. I can acknowledge that if you're
9 saying it was the first year. I mean, I don't recall
10 her first year. But --
11    Q. Okay. Did you testify earlier that you
12 think Cathy Henry started in 2015?
13    A. I thought it was 2015 or 2016.
14    Q. Okay. Would it make sense if she had
15 started in 2016, would she be receiving this letter
16 on March 9, 2016?
17    A. Yes, if she was with us in 2015, she would
18 be getting this -- the letters that we send out in
19 March of the following year.
20    Q. Okay. From the fact that she received a
21 bonus for the year ending 2015, do you conclude that
22 she began working for you in 2015?
23    MR. LOOBY: Objection to the form.
24

9 (Pages 30 - 33)

CONFIDENTIAL

Page 34

1 BY THE WITNESS:
2    A.   Yeah, I'm -- I'm assuming -- I'm not sure
3 of her start date.  But she must have been with us
4 2015 to get this letter in '16.
5    MS. HENRY:  Okay.  All right.
6 BY MS. HENRY:
7    Q.   And is the $25,000 bonus evidence of a
8 full bonus, a partial bonus?  What does that
9 represent, as far as you recall, from 2016?
10    MR. LOOBY:  Objection to form.
11    THE WITNESS:  Yeah.
12 BY THE WITNESS:
13    A.   I don't -- I don't -- I don't know what
14 her salary was.  So bonuses are based on percentage
15 of salary and how much of their goals they
16 accomplish.  So I don't know what percentage that
17 would -- that would be.
18    MS. HENRY:  Okay.
19 BY MS. HENRY:
20    Q.   Looking at the next page of Exhibit 2.
21       Does this -- Have you had an opportunity
22 to review it?
23    A.   I can -- I have seen this, yes.
24    Q.   Okay.  So what does this next page tell

Page 35

1 you?
2    A.   It tells me that she did get a bonus the
3 following year.  Part of their bonus is -- I believe
4 it's time based as well, as well as performance.
5 What I could read, it's hard to read, but it says
6 that we did not achieve all our goals, we did not
7 reach the goal required, I guess, for full payouts.
8 But she did get a -- She did get a -- She did get a
9 bonus.
10    Q.   Okay.  And what was the amount of that
11 bonus?
12    A.   It looks like 37,500.
13    Q.   Okay.  And that represents an increase
14 over the previous year's bonus; is that right?
15    A.   Depending on her pay.  I mean, she might
16 have had an increase in pay increases her bonus
17 automatically as a percentage.  So I'm not exactly
18 sure what percentage of her pay that bonus
19 constitutes.
20    Q.   Moving to the next page.
21    MR. LOOBY:  Melissa, can just say what the Bates
22 number is on the page just so we're clear --
23    MS. HENRY:  Sure.
24    MR. LOOBY:  -- because I think the pages are out

Page 36

1 of order.
2    MS. HENRY:  The witness just testified --
3 They're in reverse order.  So out of order.  Okay.
4 This is Bates 48, Henry 48.  The witness just
5 testified -- testified about Henry 49.  So --
6    MR. LOOBY:  Thank you.
7    MS. HENRY:  -- we're moving backwards.  Okay.
8 BY MS. HENRY:
9    Q.   Mr. Pappas, have you had an opportunity to
10 review what your counsel has just specified as
11 Henry 48?
12    A.   We're looking at the letter dated 2000 --
13 for year ending 2017, if that's what you're talking
14 about.
15    MS. HENRY:  Okay.  That's one.  I just figured
16 out how -- Is it bigger for you guys?  Did that work?
17    THE WITNESS:  Yep.
18    MS. HENRY:  Great.
19 BY MS. HENRY:
20    Q.   And reviewing this document, what does it
21 reflect?
22    A.   It reflects that we did not reach the goal
23 required, I guess, for total payout of our 2017 plan.
24 But she did receive a bonus.

Page 37

1    Q.   And what was the amount of that bonus?
2    A.   Forty-five thousand.
3    Q.   And is that an increase over the previous
4 year's bonus?
5    A.   Yes, it is.
6    Q.   All right.  So what do you conclude from
7 that number, if anything?
8    A.   I conclude that, again, we try to give
9 everybody a -- a bonus -- a bump in salary every
10 year.  So it could mean that she got a bump in salary
11 which gave her a larger bonus pool, or they
12 accomplished more of their goals and -- in that year.
13    Q.   Do you know whether or not Cathy Henry
14 ever received an increase in salary between 2015 and
15 2017?
16    A.   Do I know exactly, no.
17    Q.   And, finally, I'm scrolling down to what
18 is Henry 47.  It's the fourth page of Exhibit 2.
19 Please take a moment to read that.
20    A.   Okay.
21    Q.   So have you had an opportunity to review
22 that fourth page of Exhibit 2?
23    A.   Yes.
24    Q.   And what does that reflect?

10 (Pages 34 - 37)

CONFIDENTIAL

Page 38

1    A.   It reflects that we did not hit a hundred
2  percent of our corporate goals.  And she got a payout
3  of $72,872 for that year.
4    Q.   Okay.  And is that an increase over the
5  previous year's bonus?
6    A.   It seems that it is.
7    Q.   And, again, do you know whether or not
8  Cathy received an increase in salary in -- for the
9  year ending 2018?
10   A.   I do not know if she received an increase.
11   Q.   Based on the -- the four notices of bonus
12  that you just reviewed -- I'm sorry, let me stop
13  sharing.  -- what conclusion do you draw about
14  whether or not Cathy Henry was meeting or exceeding
15  Chefs' Warehouse expectations of her performance?
16   MR. LOOBY:  Objection to form.
17  BY THE WITNESS:
18   A.   Yeah.  Just -- I didn't realize that we
19  were questioning her performance.  I mean, she was
20  not let go because of performance.  She was let go
21  because she broke a very serious policy for the
22  company.  So just not on my radar.  It was never on
23  the radar that Cathy Henry was gonna be let go for
24  performance.  There was nobody being groomed for that

Page 39

1  position, and -- I'm imagining that she was doing
2  a -- a good job and she was moving up in the company.
3  BY MS. HENRY:
4    Q.   So when your -- When your company filed an
5  answer in federal court indicating -- denying
6  Ms. Henry's representation that she consistently
7  exceeded performance expectations, it's your
8  testimony that that denial was wrong, that that's
9  inaccurate, is that true?
10   MR. LOOBY:  Objection to the form.
11  BY THE WITNESS:
12   A.   She -- Yeah -- I mean, she could not have
13  been meeting the expectation, okay, of her goals.
14  That doesn't mean that she wasn't doing -- you know,
15  she wasn't trying her best.  Again, meeting your
16  goals, there's lots of things that have to work, you
17  know -- You have to have a tailwind as well.  You
18  have to have a good market.  You know, consumers need
19  to be spending money.  Operations needs to run
20  correctly.  So there's lots of things that go into
21  hitting your -- you know, your financial goals.
22  BY MS. HENRY:
23   Q.   Was Cathy Henry meeting Chefs'
24  expectations for her performance?

Page 40

1    MR. LOOBY:  Objection to form.  Asked and
2  answered.  This is the third time you've asked the
3  same question.
4    MS. HENRY:  You can answer.
5  BY THE WITNESS:
6    A.   That I don't know.
7    MS. HENRY:  All right.  I'm going to open --
8  introduce another exhibit here.
9  BY MS. HENRY:
10   Q.   Can you see on your screen what I have
11  marked as Exhibit 3?
12   A.   Yes.
13   Q.   Okay.  I will give you an opportunity to
14  review it.
15   A.   Yeah --
16   Q.   Mr. Pappas --
17   A.   Is there a date on this?
18   Q.   I'll give you a chance to review it again.
19  You can conclude for yourself.
20   A.   Can you start at the top.
21   Q.   Yes, sir.
22   A.   The Regional Vice President, Midwest will
23  be responsible -- Was there a date of this -- this
24  job offering?  I don't -- I don't see a date.

Page 41

1    Q.   Well, let's go through it.
2         Have you seen this job description before?
3    A.   I -- I don't remember.
4    Q.   Do you know who prepared it?
5    A.   Human Resources.
6    Q.   You've -- You've asked whether or not it
7  has a date.  And my examination does not include one.
8  But I would draw your attention to this paragraph
9  that -- where the cursor is -- or where the arrow is.
10  Take an opportunity -- take a chance to review what
11  I've highlighted there, please.  All right.
12   MR. LOOBY:  So just for the -- Just for the
13  record, you're highlighting -- And tell me if I'm
14  incorrect -- the third paragraph that begins with
15  plans for a new location?
16   MS. HENRY:  Yep.
17   MR. LOOBY:  Okay.  Thank you.
18   MS. HENRY:  And inadvertently highlighting
19  everything below it as well.  But, you know, we'll
20  have to live with it -- my limited cursor skills.
21  BY MS. HENRY:
22   Q.   So having reviewed the highlighted
23  paragraph, Mr. Pappas, what do you conclude about
24  when this job description might have been prepared?

11 (Pages 38 - 41)

CONFIDENTIAL

Page 42

1    A.   It states Allen Brothers as part of it,
2 so -- I don't know.  It might have been a time when
3 we purchased Allen Brothers.  If I had to take a
4 guess, somewhere 2000 and -- you know, when we bought
5 Allen Brothers in 2017.
6    Q.   When did you buy Allen Brothers?
7    A.   I'm not sure.
8    Q.   Okay.  In the sentence that I first
9 highlighted for you it talks about plans for new
10 location being completed within the next 6 to 10
11 months which would provide one consolidated Allen
12 Brother's facility adjacent to the newly built Chefs'
13 Warehouse.
14        Is that accurate?  Did you see that
15 paragraph?
16    A.   I -- I could see the paragraph, yes.
17    Q.   Okay.  Does this -- Is this the job that
18 you hired Catherine Henry to do?
19    A.   That I'm not sure.  I didn't -- I don't
20 recall that she was -- Unless they had the need to
21 bring her in to help manage Allen Brothers, which
22 usually you bring in somebody who comes from the
23 protein business and manufacturing business.
24    Q.   So is it your testimony that Cathy Henry

Page 43

1 was not -- this was not her job description?
2    A.   It could have been because of needs, but
3 it's typically not -- We typically don't combine
4 responsibilities of our operating broadliners and our
5 production facilities.  It's usually a much different
6 skill-set.
7    Q.   You say you typically do not combine the
8 roles.  Why would -- And you said that it's a
9 different skill-set.  Can you help me understand what
10 that means?
11    A.   Running a -- Running a production -- I
12 mean, we bought Allen Brothers.  Allen Brothers was
13 losing a lot of money and continued to lose many
14 for -- for many years.  It just requires a lot of
15 different knowledge of understanding how to buy and
16 process and run a production facility.  A lot
17 different than running a -- a broadline distribution
18 business that is really selling boxes and there is no
19 production involved.  So in -- In food service these
20 facilities are -- are usually separated and they're
21 run by different types of management.
22    Q.   So are you surprised to see a job
23 description that combines those two roles?
24    A.   Yeah, I think it was just probably, again,

Page 44

1 need.  You know, again, it was a new business for us
2 in Chicago.  It took quite a bit of time before we
3 turned them profitable.  So, you know, regionally,
4 again, we do lots of things to get through what we
5 have to do through hard times.  So I'm imagining that
6 they combined them for a period of time.
7    Q.   Would that be a challenging role for an
8 incoming Regional Vice President?
9    A.   Yes.
10    MR. LOOBY:  Objection to form.
11        I'm sorry.  Go ahead, Chris.
12 BY THE WITNESS:
13    A.   All these jobs are challenging.  This is
14 not an easy industry.
15 BY MS. HENRY:
16    Q.   Are you aware whether or not Cathy Henry
17 ever had a different job description than this?
18    A.   I don't recall.
19    Q.   To whom have you delegated the
20 responsibility to prepare and maintain updated job
21 descriptions?
22    A.   Well --
23    MR. LOOBY:  Objection to form.
24

Page 45

1 BY THE WITNESS:
2    A.   Yeah.  Human Resource oversees it.  But
3 every region -- You know, again, you know, we run 38,
4 I believe, operating companies, so it's a little
5 complex, and every region is constantly, I guess,
6 updating and adapting to the business environment.
7 BY MS. HENRY:
8    Q.   So who -- Who would have been -- Whose
9 role would it have been to update and adapt to the
10 business environment that is described in this job
11 description?
12    A.   Probably Tyler Hawes or a senior executive
13 at the time who's overseeing the region.
14    Q.   Would HR have a role in updating and
15 adapting a job description?
16    A.   HR would definitely be working with the
17 senior executive.
18    Q.   Is it your expectation that Human
19 Resources has a practice of keeping job descriptions
20 up to date?
21    MR. LOOBY:  Objection to form.
22 BY THE WITNESS:
23    A.   Human Resources is a support function to
24 the Executive Team.  They don't run the day-to-day

12 (Pages 42 - 45)

CONFIDENTIAL

Page 46

1  business.  They're there as a checks and balance to
2  basically report to me that we have checks and
3  balances in the company.
4  BY MS. HENRY:
5      Q.   So do you -- During the periods of time
6  when Cathy Henry reported to you, do you recall ever
7  asking to see her job description?
8      A.   No.
9      Q.   Have you expressed to your Executive Team
10 an expectation that ensure -- employees should have
11 accurate job descriptions?
12     A.   I mean, obviously we expect accurate job
13 descriptions.  But, you know, anybody -- any person
14 who's run a business knows that it changes daily,
15 there's constant headwinds and, you know, people
16 leave, things happen unexpectedly, and everybody
17 chips in and adapts.  I can't imagine we're changing
18 a job description on the fly every day.  So I think
19 we do our best.  But I'm sure it's not something
20 that's -- I think it's very fluid.
21     Q.   So how does Chefs' Warehouse expect an
22 employee to know what is expected of them in the
23 absence of an accurate job description?
24     MR. LOOBY:  Objection to form.

Page 47

1  BY THE WITNESS:
2      A.   I think, again, a business, you know, it's
3  alive and breathing and it's adapting every day.  You
4  know -- We look to hire qualified people.  If we're
5  not doing a good job as employers, people, you know,
6  I imagine, would leave.  So we do our best to make it
7  a great place -- a great place to work and -- I'm --
8  You know, I'm a little surprised of where -- you
9  know, the questioning because I thought -- I mean,
10 Cathy Henry was not let go because of her
11 performance.  So I'm -- Maybe I'm just not informed
12 of what this purpose was today of my deposition.  I
13 could have maybe prepared more and went very granular
14 of her performance day by day, you know, with those
15 past years.  But I wasn't under the impression that
16 this is what my deposition was for.
17 BY MS. HENRY:
18     Q.   Is it your expectation that an executive
19 to whom a Regional Vice President would report would
20 communicate with the Regional Vice President about
21 their expectations of their performance?
22     A.   My expectation is that there's a constant
23 communication.  Most of our executives speak 10, 12
24 times a day.  It's a -- It's a business that there's

Page 48

1  high expectation by the customers.  It's -- It's same
2  day to next day delivery, and there's lots of moving
3  pieces.  Fifty thousand items flow through the
4  systems, with many facilities, 40 countries, 2,000
5  suppliers.  So it's very complicated.  It's constant
6  communication for this to work.
7      Q.   So when Cathy Henry reported to you, did
8  you speak to her 10 to 12 times a day?
9      A.   I was interim.  I was just trying to hold
10 the line until we reorganized.  So I spoke to her as
11 much as possible, and I visited her as much as
12 possible.
13     Q.   Do you know whether or not Cathy Henry
14 spoke -- or whether Pat O'Callaghan spoke to Cathy
15 Henry 10 to 12 times a day?
16     MR. LOOBY:  Objection to form.
17 BY THE WITNESS:
18     A.   Yes.  I do not know the exact amount that
19 they spoke.  But I imagine for them to have success,
20 they had to communicate.
21 BY MS. HENRY:
22     Q.   Do you -- Do you know whether or not Pat
23 O'Callaghan consistently communicated to Cathy Henry?
24     A.   I know that they did communicate.  I

Page 49

1  attended meetings with both of them there, and
2  events, and I'm assuming, you know, that they spoke
3  as often as they needed to.
4      MS. HENRY:  Okay.  Counsel, with your
5  indulgence, I would like to take a 10-minute break
6  and resume thereafter.
7      MR. LOOBY:  Yeah, that sounds good.
8      MS. HENRY:  Is that okay with everyone?
9      THE WITNESS:  Yes.
10     MS. HENRY:  Thank you.
11     THE VIDEOGRAPHER:  Okay.  We're going off the
12 record.  Time on the monitor is 9:56 a.m.
13         (WHEREUPON, WE WERE OFF THE
14          RECORD.)
15     THE VIDEOGRAPHER:  We're back on the record.
16 The time on the monitor is 10:15 a.m.
17     MS. HENRY:  Thank you.
18         For the record, and first of all, please
19 accept my apology if I did not so represent at the
20 beginning of the deposition.  My client, Catherine
21 Henry, is, in fact, accompanying.
22     MR. LOOBY:  Thank you.
23     MS. HENRY:  You're welcome.
24     MR. LOOBY:  And one other thing while we're on

13 (Pages 46 - 49)

CONFIDENTIAL

Page 50

1 the record. Melissa, pursuant to our agreed
2 confidentiality order, Section 4, we're going to
3 designate this transcript as confidential pending
4 submission of an additional notice of designation
5 pursuant to the terms of the order.
6    MS. HENRY: Understood.
7    MR. LOOBY: Great. Thank you.
8 BY MS. HENRY:
9    Q. What kind of a team did you observe Cathy
10 Henry (inaudible) when she was managing Chefs'
11 Warehouse Chicago, Mr. Pappas?
12    THE REPORTER: I'm sorry. You broke up there,
13 Ms. Henry, for me.
14    MS. HENRY: Oh, thank -- I'll re -- Thank you.
15 Sorry, Madam Court Reporter
16 BY MS. HENRY:
17    Q. Ms. Pappas, what kind of a team did you
18 observe that Cathy Henry assembled when she managed
19 Chefs' Warehouse Chicago?
20    A. What kind of a team? Well, she had
21 operations people. She had salespeople. We did at
22 least -- Well, we did at least one acquisition, I
23 remember. We moved into our -- our new building.
24 And she must have built a bigger team especially with

Page 51

1 the acquisition.
2    Q. Did you make any observation about the
3 quality or -- or nature of the team? For example,
4 did you observe that her team was diverse?
5    A. Did I observe -- I mean -- I know there
6 was a lot of new people when we did the acquisition,
7 so there was -- I'm really -- You know, I'm really
8 color blind. I look for talent. I look for people I
9 think that can move the company forward. So it's
10 not -- I know she had -- She had women in the office.
11 She had men in the office. Down in the operation
12 it's mainly men, down in the warehouse, and there's
13 drivers. So I think that's my observation.
14    Q. Do you know how Cathy Henry's salary
15 compared to that of other Regional Vice Presidents at
16 Chefs' Warehouse?
17    A. I'm sure it was in line and appropriate
18 for the role.
19    Q. When you say you're sure, how do you know
20 that?
21    A. Because I'm very proud of running a very
22 equitable company, and Human Resources works very
23 hard and is very responsible to make sure that people
24 are paid equitable and there's no discrimination at

Page 52

1 all to your race or your gender to your pay.
2    Q. Do employees at Chefs' Warehouse, is their
3 salary reviewed annually?
4    A. I think there's a discussion through
5 leadership and their teams. You know, compensation
6 is always something that's discussed.
7    Q. Do Regional Vice Presidents at Chefs'
8 Warehouse receive periodic salary increases?
9    A. It's usually a yearly review, you know,
10 whether there should be a merit increase on how the
11 company performed.
12    Q. So an employee who worked at Chefs'
13 Warehouse for five years, should that employee have
14 expected more than one salary increase?
15    A. Depending on their territory and the
16 territory's performance, I imagine it's reviewed and
17 there's either merit increases or there's not,
18 depending, I guess, on the performance of the region.
19    Q. So you articulated a principal to equity
20 in salary, and you articulated your expectation that
21 Human Resources work hard to make sure that there's
22 pay equity.
23        But do you know for a fact whether or not
24 Cathy Henry's compensation was comparable to other

Page 53

1 Regional Vice Presidents?
2    A. I know that --
3    MR. LOOBY: Objection, form.
4 BY THE WITNESS:
5    A. I know that qualified people do not stay
6 if they're not being compensated appropriately. So
7 we have to remain -- We have to maintain a very
8 competitive pay environment, and we have many
9 employees and many leaders here for 25 and 30 years,
10 so I think that HR is doing a good job making sure
11 that our -- our executives and our Leadership Team
12 are well compensated.
13 BY MS. HENRY:
14    Q. Did you know for a fact whether or not
15 Cathy Henry's salary was in line with other Regional
16 Vice Presidents at Chef -- Chefs' Warehouse?
17    A. No, I do not.
18    MR. LOOBY: Objection to form. Asked and
19 answered.
20 BY MS. HENRY:
21    Q. Does Chefs' Warehouse have a policy or a
22 mechanism for handling, investigating or responding
23 to allegations of pay disparity or inequity?
24    A. Yes.

14 (Pages 50 - 53)

CONFIDENTIAL

Page 54

1    MR. LOOBY:  Objection to form.
2        Chris, you can answer.
3  BY THE WITNESS:
4    A.  Yes.  HR -- HR is constantly reviewing
5  every piece of, you know, what's involved in running
6  a first-class business of -- Basically we're in the
7  people business, so Human Resources is involved
8  with -- with making sure that we are, you know,
9  hitting above our weight and doing whatever we can to
10  make it a great place to work.
11  BY MS. HENRY:
12    Q.  So consistent with that practice of doing
13  whatever we can to make it a great place to work, are
14  Executive Vice Presidents expected to address or
15  report when an employee expresses concern about pay
16  disparity?
17    MR. LOOBY:  Objection to form.
18  BY THE WITNESS:
19    A.  You know, again, I imagine that there is
20  dialogue amongst the Executive Teams and Human
21  Resources, and if it's something that cannot be
22  settled, it -- it -- it probably will hit my desk
23  eventually.  So it's just not something that I can
24  recall, you know, ever -- ever being an issue at my

Page 55

1  company.
2  BY MS. HENRY:
3    Q.  Do you expect your Executive Vice
4  Presidents to ensure fairness among employees of the
5  company in compensation?
6    A.  Yes.
7    Q.  And if you learned that an Executive Vice
8  President had received a complaint about pay equity,
9  what would you expect that Vice President to have
10  done with that?
11    A.  I would expect --
12    MR. LOOBY:  Objection to form.
13  BY THE WITNESS:
14    A.  I would expect him to go to Human
15  Resources and to explain why someone is paid X and
16  someone is paid Y, and if it's something that's an
17  issue, it would come to my desk.
18  BY MS. HENRY:
19    Q.  Do you know whether or not Pat O'Callaghan
20  ever reported to Human Resources that Cathy Henry had
21  raised a concern about pay equity?
22    A.  No.
23    Q.  If you learned that Pat -- Cathy Henry had
24  made a complaint about pay equity to Pat O'Callaghan,

Page 56

1  would you have expected him to forward that to Human
2  Resources?
3    A.  Yes.
4    Q.  Are Executive Vice Presidents expected to
5  ensure fairness company-wide?
6    A.  They're expected to show --
7    MR. LOOBY:  Objection to form.
8  BY THE WITNESS:
9    A.  Everybody in the company is expected to
10  show fairness.
11  BY MS. HENRY:
12    Q.  Does Chefs' Warehouse have a policy or
13  mechanism for handling, investigating, responding to
14  allegations of inequity or lack of equal opportunity?
15    A.  Yes.
16    MR. LOOBY:  Objection to form.
17  BY MS. HENRY:
18    Q.  What is that policy or mechanism that
19  Chefs' Warehouse has for handling, investigating or
20  responding to allegations of inequity?
21    MR. LOOBY:  Objection to form again.
22  BY THE WITNESS:
23    A.  It's a Human Resource issue, and Human
24  Resources takes care of it.

Page 57

1  BY MS. HENRY:
2    Q.  Do you receive periodic reports from Human
3  Resources about allegations of inequity or lack of
4  equal opportunity at Chefs' Warehouse?
5    A.  I meet with Human Resources.  Human
6  Resources reports directly to me.  So I am in the
7  loop if there's an issue.
8    Q.  Did Human Resources ever tell you that
9  Cathy Henry had expressed concern about inequity and
10  lack of equal opportunity at Chefs' Warehouse?
11    A.  Not that I recall, no.
12    Q.  Does Chef Warehouse have -- Chefs'
13  Warehouse have an equal opportunity policy?
14    A.  We have many policies, you know, in -- in
15  line with every public company in America, and our
16  General Counsel works very hard to make sure our
17  policies are -- are best in class.
18    Q.  Who's responsible for administering the
19  Human Resource -- the -- I'm sorry -- the equal
20  opportunity policy?
21    A.  I imagine it's a combination of General
22  Counsel and Human Resources.
23    Q.  Do you have a role in ensuring that the
24  policy is adhered to and -- and that someone is

15 (Pages 54 - 57)

CONFIDENTIAL

Page 58

1 administering it?
2    A.   I have --
3    MR. LOOBY:  Objection to form.
4 BY THE WITNESS:
5    A.   Yeah, as -- As CEO, I mean, I'm
6 responsible at the end of the day for everything, and
7 everyone knows what I expect, that we run a -- a
8 completely color blind and -- and gender --
9 There's -- There's absolutely no tolerance for racism
10 or any sort of holding people down because of gender,
11 race or anything, you know, of substance like that.
12 BY MS. HENRY:
13    Q.   Have you or your Leadership Team received
14 any training on complying with Chefs' Warehouse equal
15 opportunity policy?
16    A.   There's constant training.  There's always
17 room for improvement.  But it -- it's something that
18 we do spend a -- a large amount of money constantly
19 trying to improve, and we're very proud of that.
20    Q.   Do you have any expectations of your
21 Executive Vice President about diversity, equity and
22 inclusion?
23    A.   Yeah, we expect him --
24    MR. LOOBY:  Objection to form.

Page 59

1 BY THE WITNESS:
2    A.   We expect him, like every company, to
3 again be color blind, gender blind, and hire the best
4 possible people.  And as the -- the father of three
5 daughters, you know, I'm extremely pro trying to, you
6 know, hire as diverse workforce as possible and
7 always have been since I started the business.
8 BY MS. HENRY:
9    Q.   Do you evaluate efforts to have Chefs'
10 Warehouse reflect your commitments to color blind and
11 gender blind employment practices?
12    A.   We encourage it.
13    Q.   Do you do annual assessments to evaluate
14 your company's progress on its commitments to gender
15 blind and race blind hiring practices?
16    A.   It's a lot more complicated than that
17 since we run so many different warehouses and night
18 shifts and sales forces.  But I could say, though,
19 extremely proud.  You know, for many years we were --
20 I know when I was more on the day to day before the
21 company got too big that we had the largest sales
22 force of -- of women, I believe, for our dollar size
23 in the -- in the country.  And the West Coast is run
24 by -- The senior leader is a Asian minority and

Page 60

1 is -- Two of his top -- Two of the top people that
2 run the West Coast were either female or of some
3 minority.  And we are very proud of that.  And I was
4 very proud about my Chief Operations Officer being a
5 woman.  And we continue to encourage hiring the best
6 possible people and trying to be as diverse as
7 possible.
8    Q.   So do you have an annual or a periodic
9 assessment of your progress on those fronts?
10    A.   We're --
11    MR. LOOBY:  Objection to form.  Asked and
12 answered.
13       Chris, just -- if you could try and wait
14 for me to make my objections, it would be cleaner for
15 the court reporter.
16    THE WITNESS:  Thank you.
17    MR. LOOBY:  Go ahead.
18    THE WITNESS:  Um-hum.
19    MS. HENRY:  So now that you've objected,
20 Counsel, can the -- I mean, the witness can answer
21 the question.
22    MR. LOOBY:  Yes, please.
23 BY THE WITNESS:
24    A.   Yeah.  There's -- There's many, many

Page 61

1 policies and, I would say, forums that Management
2 Teams run.  I really expect and hold my executives
3 responsible to follow the vision -- follow my vision
4 of running a diverse and equitable company.  So is it
5 something that they meet upon every day?  I think
6 that would be over expectation.  They are extremely
7 busy trying to run the business, especially today
8 with such labor shortages, but they do understand the
9 vision and the ethos of the company of who we are,
10 and we're very proud of who we are, running an
11 equitable company, and we're always trying to do
12 better.
13 BY MS. HENRY:
14    Q.   Do you evaluate your direct reports on
15 progress that they make, the commitment to a gender
16 blind and race blind workplace?
17    A.   I would think that's an overreach.  But we
18 do evaluate if we have the right leaders who are
19 following the vision of the company to run a very
20 diverse and equitable company.
21    Q.   You talked about accomplishments of the
22 company with respect to leadership in your West Coast
23 facilities.
24       How about in the Midwest, what kind of

16 (Pages 58 - 61)

CONFIDENTIAL

Page 62

1  diversity initiatives or accomplishments can you talk
2  about in the Midwest?
3      A.  I think the Midwest, you know, it's still
4  a new territory for Chefs' Warehouse.  It's been a
5  growing business with multiple acquisitions.  And I
6  expect the same, you know, of the leadership there,
7  to do their best to try to hire the best possible
8  people, and -- Again, there is -- There is no
9  tolerance for racism at our company.  So whether we
10 talk about it every minute, every hour, every day,
11 there's just, you know -- There is no tolerance.
12 Someone -- Someone who's a racist or is making
13 decisions based on gender would be fired.
14     Q.  Are you aware that Cathy Henry raised
15 concerns about the diversity of leadership in the
16 Ohio sales force?
17     MR. LOOBY:  Objection to form.
18 BY THE WITNESS:
19     A.  No, I'm not aware.
20 BY MS. HENRY:
21     Q.  Did Pat O'Callaghan ever tell you that
22 Cathy Henry raised concern about the lack of female
23 representation after a sales meeting in Ohio in March
24 of 2018?

Page 63

1      A.  Not that I recall.  But since she was in
2  charge of hiring, I -- I can't imagine that, you
3  know, that would be Pat O'Callaghan's issue if Cathy
4  Henry was doing the hiring.
5      Q.  Did Cathy Henry do the hiring for the Ohio
6  sales force?
7      A.  Oh, Ohio sales force?  No.
8      Q.  Who did do the hiring for the Ohio sales
9  force?
10     A.  I guess the leadership that runs -- We
11 have multiple businesses there.  But I could say that
12 the last time I attended sales meetings pre-Covid,
13 I saw -- I saw many females as part of that sales
14 force, if that means anything.
15     Q.  When was that?
16     A.  Pre-Covid.
17     Q.  Can you be more specific?
18     A.  No.
19     Q.  Do you recall where that sales meet was?
20     A.  In Ohio.
21     Q.  Was Cathy Henry at the meeting?
22     A.  I don't recall.
23     Q.  Was Pat O'Callaghan at the meeting?
24     A.  I don't recall.

Page 64

1      Q.  What else do you recall about that
2  meeting?
3      A.  I recall it was a great meeting.  There
4  was many salespeople from all over Ohio.  I was very
5  impressed with the team and the talent in the room.
6  And I was very proud that they worked for me.
7      Q.  Were there any sales leaders in attendance
8  at that conference, that you recall?
9      A.  I don't recall.  But I imagine there were
10 some.
11     Q.  Do you imagine that any of them were
12 women?
13     A.  I imagine that they -- there were women
14 that were leaders in that sales force, yes.
15     Q.  Do you have any recollection of any
16 specific women who were leaders in the sales force in
17 Ohio?
18     A.  No.  But I know that it's an industry
19 that, you know, we're pushing for more women to enter
20 in.  When I started the company there was almost no
21 women in the companies that I was competing with.  So
22 I think that Chefs' has done a great job of really
23 trying to bring more women into the industry and try
24 to advance them into leadership positions.

Page 65

1      Q.  So getting back to that sales meeting that
2  was before Covid.
3          You don't recall when it was, and you
4  don't recall whether Cathy Henry was there or Pat
5  O'Callaghan was there; is that correct?
6      A.  No, I recall that it was held at a hotel
7  conference room, and I flew in to give a speech and
8  shake hands and be part of it.  I thought it was a
9  great event.  But that's what I recall.
10     Q.  You talked about comparing Chefs'
11 Warehouse to other public food service companies.
12         And how do you know how -- how Chefs'
13 Warehouse compares to other publicly-held food
14 service companies?
15     A.  As soon as I started --
16     MR. LOOBY:  Objection to form.
17         You can answer.
18     THE WITNESS:  Okay.
19 BY THE WITNESS:
20     A.  Since I started the business, I was on the
21 ground floor of growing the company and competing
22 with all my competitors, and rarely did I ever run
23 into, you know, female salespeople or female sales
24 leaders.  So I was -- I was always commended that I

17 (Pages 62 - 65)

CONFIDENTIAL

Page 66

1  kind of broke the barrier here in New York where the
2  company started. And to this day, you know, we have
3  two female board members. I think, in proportion,
4  probably a higher ratio than all the other public
5  food companies in the country. So it's just
6  something that I was always proud of, just the same
7  way I was proud that Cathy Henry was one of our
8  female leaders when she was at Chefs' Warehouse.
9  BY MS. HENRY:
10    Q.   Who are your current female leaders at
11  Chefs' Warehouse?
12    MR. LOOBY:   Objection to form.
13         Melissa, just to be specific. Do you mean
14  the entire company or do you mean a particular
15  subsidiary?
16    MS. HENRY:   I mean, the Defendants who have been
17  named in this lawsuit.
18    MR. LOOBY:   Okay. So Chefs' Warehouse Midwest
19  and Allen Brothers.
20    MS. HENRY:   Fair enough.
21  BY MS. HENRY:
22    Q.   Who are your current female leaders at
23  Chefs' Warehouse Midwest and Allen Brothers?
24    A.   Well, from the top one of the four people

Page 67

1  in the C-Suite is Pat Lecouras. Nikki Thomas on the
2  West Coast I know is in the top three of the West
3  Coast Leadership Team. I know that Andrea Parkins --
4    Q.   Is Nikki Thomas part -- I'm sorry, sir.
5  Is Nikki Thomas part of Chefs' Warehouse Midwest --
6    A.   Yes.
7    Q.   -- or Allen Brothers?
8    A.   She's part of the West -- Chefs' Warehouse
9  West Coast.
10    Q.   Is Chefs' Warehouse West Coast part of
11  Chefs' Warehouse Midwest?
12    A.   No. There's -- Well, you could call
13  them -- You know, by -- We could separate them by
14  geography. But it's all one big Chefs' Warehouse.
15    Q.   Okay. We got Nikki Thomas. We got Pat
16  Lecouras. Who else?
17    A.   We have Andrea Parkins that I know works
18  in New York. She's part of the -- I would say the
19  top three positions that runs our largest company in
20  the company.
21    Q.   How long has Andrea Parkins been with
22  Chefs'?
23    A.   How long has she been here?
24    Q.   Yes.

Page 68

1    A.   I would say at least five years.
2    Q.   What is her title?
3    A.   That I'm not sure of.
4    Q.   How about Nikki Thomas, how long has she
5  been with Chefs' Warehouse West Coast?
6    A.   I would say at least ten years.
7    Q.   What's her title?
8    A.   I'm not sure.
9    Q.   Pat Lecouras, how long has she been with
10  Chefs' Warehouse?
11    A.   About 14 years.
12    Q.   And what's her title?
13    A.   Head of Human Resources.
14    Q.   Is that a Vice President level position?
15    A.   Much higher. She's one of the top four
16  executives in the company.
17    Q.   Okay. Thank you.
18         So do you -- Did you ever learn that Cathy
19  Henry asked Pat Lecouras to re-calculate salaries and
20  correctly compensate Chefs' Warehouse salespeople?
21    A.   I don't understand that question.
22    Q.   Did you ever learn that Pat Lecouras was
23  asked to re-calculate salaries and correctly
24  compensate Chefs' Warehouse salespeople?

Page 69

1    A.   I still don't understand. I mean, she's
2  constantly working on compensation with leadership.
3  We just -- I mean, we just recently re-did our whole
4  commission structure this week. So it's -- It's
5  something that's fluid and it's constantly being
6  evaluated and modified.
7    Q.   Okay. Are you aware that there was an
8  incident when Chefs' Warehouse salespeople's salary
9  did not include Allen Brothers sale?
10    A.   I don't recall.
11    Q.   Did Pallaghan -- Pat O'Callaghan ever tell
12  you that he had to intervene to correct an error in
13  calculating salespeople's annual compensation?
14    A.   (Inaudible)
15    THE REPORTER:   I'm sorry. I didn't hear the
16  answer.
17  BY THE WITNESS:
18    A.   I don't recall.
19  BY MS. HENRY:
20    Q.   Who is Pat O'Callaghan?
21    A.   Who is he?
22    Q.   Yes.
23    A.   He's an employee of the Chefs' Warehouse.
24    Q.   What's his title?

18 (Pages 66 - 69)

CONFIDENTIAL

Page 70

1    A.   I believe Executive Vice President of the
2 Northeast.
3    Q.   Do you know for roughly how long he's held
4 that title?
5    A.   No.
6    Q.   Did you hire Pat O'Callaghan to be the
7 Executive Vice President Northeast for Chefs'
8 Warehouse?
9    A.   I bought Pat O'Callaghan's company.  I
10 don't know how many years ago.  And he's held a few
11 titles since we purchased his company.
12    Q.   How long has he been in the role of
13 Executive Vice President Northeast Chefs' Warehouse?
14    A.   I don't recall.
15    Q.   Did you know Pat O'Callaghan before you
16 acquired his company?
17    A.   No, I did not know him before we bought
18 his company.
19    Q.   How often do you talk to Pat O'Callaghan?
20    A.   Sometimes once a week.  Sometimes twice a
21 day, depending on what's -- what's happening in the
22 business.
23    Q.   In an ordinary week, how often would you
24 expect to talk to Pat O'Callaghan?

Page 71

1    A.   Since he's one of my five, six direct
2 reports, I would imagine -- I would like to speak to
3 him once a day but it doesn't always happen.
4    Q.   Did you ever talk to Pat O'Callaghan about
5 his supervision of Cathy Henry?
6    A.   When Cathy Henry was with us, it must have
7 been part of our review processes.
8    Q.   Do you have any specific recollections of
9 talking to Pat O'Callaghan about his supervision of
10 Cathy Henry?
11    A.   The recollection I have was discussing --
12 You know, we talked numbers, so we were always
13 talking numbers, and what issues and growth.  I mean,
14 again, it's -- Out of $2 billion, that business was
15 about 50 million.  So it's a very small part of the
16 overall Chefs' Warehouse.  So, you know, you divide
17 and conquer.
18    Q.   What was the company that you acquired
19 that -- that Pat O'Callaghan came to Chefs' Warehouse
20 with?
21    A.   It was called Queensgate.
22    Q.   Did you make the decision to acquire
23 Queensgate?
24    A.   It's part of a Board decision.  But as

Page 72

1 CEO, obviously, I'm responsible for it.
2    Q.   Did you review any of the employment
3 practices at -- Did you review any of the employment
4 practices at Queensgate before you made the decision
5 to acquire it?
6    THE REPORTER:  I'm sorry, you broke up, Ms. --
7 You broke up
8    MS. HENRY:  I'm sorry.  Sorry, Madam Court
9 Reporter.
10 BY MS. HENRY:
11    Q.   Did you review any of the employment
12 practices at Queensgate before you made the decision
13 to hire it?
14    MR. LOOBY:  I'm going to object to the form.
15 And I'll let the witness answer this question.  But I
16 hope we don't go down this road too much further
17 given the Court's instruction yesterday, so ...
18         Chris, you can answer the question.
19    THE WITNESS:  Thank you.
20    MS. HENRY:  The question is did he review.
21    THE WITNESS:  Yeah.
22 BY THE WITNESS:
23    A.   So every acquisition goes through a
24 process.  There's a Mergers and Acquisitions team

Page 73

1 that does the diligence.  And, obviously, Human
2 Resources and the other executives are involved in
3 it.  You know, I'm not involved on the granular
4 level.  It  was -- Again, it was not a very large
5 business.  So I was not involved in the minute
6 granular day-to-day decisions.  But I did meet Pat
7 O'Callaghan.  It did pass the test.  I would say 9
8 out of 10 companies we look at we do not by.  So it
9 met a lot of criteria, and we purchased it.
10 BY MS. HENRY:
11    Q.   Was one of the reviews that the Mergers
12 and Acquisitions team would undertake include --
13 would one of the review include a review of diversity
14 in hiring at Queensgate?
15    A.   It -- It was many years ago -- It was many
16 years ago.  But it was -- The team was always looking
17 for red flags, something that would say this is not a
18 company that we would not want to buy, and we bought
19 the company, so I imagine there was no red flags.
20    Q.   Are you aware of the Leadership Team of
21 Queensgate that came with Pat O'Callaghan to Chefs'
22 Warehouse?
23    A.   It was a very, very small company.
24    Q.   About how many people came to Chefs'

19 (Pages 70 - 73)

CONFIDENTIAL

Page 74

1 Warehouse from Queensgate, if you know?
2    A.   I imagine about 40, 50.
3    Q.   Do you know whether there were any women
4 leadership in Queensgate when Chefs' Warehouse
5 acquired it?
6    A.   I would not know that.
7    Q.   Does Pat O'Callaghan work with any of the
8 women in Chefs' Warehouse leadership that you have
9 identified to me?
10    A.   Yes.
11    Q.   Which of the women does Pat O'Callaghan
12 work with?
13    A.   Well, he's responsible for an extremely
14 large region and many operating companies.  So he
15 works with everybody, and he -- part of the round
16 table here.  So he's reporting in to Human Resources
17 which would be Pat Lecouras.
18    Q.   Anyone else?
19    A.   I don't recall.  When Ellie Thomas was
20 here, Ellie Thomas -- he reported in to Ellie Thomas.
21    Q.   How long did Pat O'Callaghan report to
22 Ellie Thomas?
23    A.   For her complete tenure as Director of
24 Operations.

Page 75

1    Q.   How long was that?
2    A.   I will say many years.
3    Q.   Do you know when Ellie Thomas left?
4    A.   I believe it was -- She retired to
5 Charleston, I think, a few months before the
6 pandemic.
7    Q.   So are -- Is it your testimony that Ellie
8 Thomas had direct supervisory responsibility for Pat
9 O'Callaghan until a few months prior to the pandemic?
10    A.   She was responsible.
11    MR. LOOBY:  Objection to from.
12 BY THE WITNESS:
13    A.   She was responsible -- All the operation
14 leaders had a direct reporting line to Ellie Thomas.
15 BY MS. HENRY:
16    Q.   Is Pat O'Callaghan an operational leader?
17    A.   He's a general leader.
18    Q.   So did Pat O'Callaghan report to Ellie
19 Thomas?
20    A.   She was responsible for operations in all
21 his regions.  So, again, it's kind of a bifurcated
22 org chart where there's direct lines, dotted lines
23 and full lines.  So anything that happened in his
24 territories, he was responsible for the P&L, but she

Page 76

1 was responsible for making sure he had the support
2 and the teams and had decision making to tell him
3 that he needed to make changes.
4    Q.   Do you know whether or not Ellie Thomas
5 ever told Pat to make changes?
6    A.   I assume she told him to make changes
7 constantly.
8    Q.   What is the assumption based on?
9    A.   We have high turnover.  It's a--
10 Unfortunately it's a -- It's a business that's a very
11 hard job in many of the operations, and -- especially
12 in the warehouse and drivers.  If you read the papers
13 today, you understand what the industry is -- The
14 industry was always going through a very hard time to
15 attract people and it's gotten worse.
16    Q.   So do you believe that Ellie Thomas gave
17 Pat O'Callaghan direction with respect to employee
18 retention?
19    A.   She gave him --
20    MR. LOOBY:  Objection as to form.
21 BY THE WITNESS:
22    A.   I am sure she gave him direction, and was
23 part of a process of hiring operational leadership.
24

Page 77

1 BY MS. HENRY:
2    Q.   Are you aware that Cathy Henry raised
3 concerns about individuals who are lower in the
4 Chefs' Warehouse organization who received the same
5 salary as her?
6    MR. LOOBY:  Objection to form.
7 BY THE WITNESS:
8    A.   I don't recall.
9 BY MS. HENRY:
10    Q.   Are you aware that Cathy Henry told Pat
11 O'Callaghan that the meat specialist from Michael's
12 Meats in Ohio made the same salary as she did?
13    A.   I don't recall.
14    Q.   Do you recall whether Pat O'Callaghan told
15 you that Cathy Henry had raised concerns about the
16 meat specialist in Ohio making the same salary as
17 her?
18    A.   No.
19    Q.   No, he did not raise concerns or, no, you
20 don't recall that he raised -- that he told you she
21 raised concerns?
22    A.   I don't recall.  I don't recall any
23 complaints.
24    Q.   Do you recall -- Are you aware of Mike

20 (Pages 74 - 77)

CONFIDENTIAL

Page 78

1 Moore?
2     A.   I know the name.  I know -- I don't know
3 if he's still an employee.  But, again, thousands of
4 employees.  I wish I was that smart to recall every
5 person that works in the company.
6     Q.   Do you know what his title was?
7     A.   No.
8     Q.   Are you -- Who is Mike Behan?
9     A.   I think he was a Regional Manager in Ohio.
10    Q.   Is he still with Chefs' Warehouse?
11    A.   I believe so.
12    Q.   Do you know what his title is now?
13    A.   No.
14    Q.   Did Pat O'Callaghan ever tell you that
15 Mike -- that Cathy Henry raised a concern to him
16 about Mike Behan's salary being practically the same
17 as hers?
18    A.   No.
19    Q.   Where does Mike Behan work?
20    A.   I believe he works in Illinois.
21    Q.   Do you know whether or not he works with
22 Pat O'Callaghan?
23    A.   If he works in Illinois, he's under Pat
24 O'Callaghan's region.

Page 79

1     Q.   I asked you if you know what his title is.
2          Do you know what his -- You don't know
3 what his title is, is that accurate?
4     A.   I do not know his title.
5     Q.   Okay.  Do you know how long Mike Behan has
6 worked in Chicago?
7     A.   No.
8     Q.   Do you know where he worked before
9 Chicago?
10    A.   I know he worked in Ohio.
11    Q.   And how do you know that?
12    A.   Because when we bought Michael's, which is
13 based in Columbus, Ohio, I believe he was part of
14 that team.
15    Q.   When did you buy Michael's?
16    A.   Over seven years ago.
17    Q.   Do you know if you bought Michael's before
18 or after Cathy Henry became an employee of Chefs'
19 Warehouse?
20    A.   We bought Michael's before.
21    Q.   And how -- Do you know about how many
22 employees of Michael's came to Chefs' Warehouse when
23 you acquired it?
24    A.   No.  But if I had to take a guess, I would

Page 80

1 say over a hundred.
2     Q.   Do you recall -- Did you participate in
3 making the decision to acquire Michael's Meats?
4     A.   Yes, I did.
5     Q.   And was part of the decision to acquire
6 Michael's Meats, did it involve an analysis or a
7 review of their --
8     THE REPORTER:  I'm sorry.  You just broke up
9 again.  Did it involve what?
10 BY MS. HENRY:
11    Q.   An analysis or a review of Michael's Meats
12 Human Resource practices?
13    MR. LOOBY:  Yeah, I'm going to object to the
14 form.  And, again, this goes to what I said before, I
15 don't see how this line of questioning is relevant.
16 So I would hope you could wrap it up pretty quickly.
17          You can answer.
18    THE WITNESS:  Yeah.
19 BY THE WITNESS:
20    A.   They went through a -- I mean, again, our
21 practice keeps evolving.  Every year we try to
22 improve it.  But, you know, it might have been even
23 ten years ago.  So I recall that the team went
24 through its diligence, and we had advisors, and

Page 81

1 outside advisors that went in to -- to deep diligence
2 because it was the first protein company that we
3 bought so we did not have a lot of expertise in that
4 business, and went under a lot of scrutiny.  It was a
5 private equity that owned it.  So it was the first
6 time we bought a company from a -- a financial
7 company.  And I knew we did our due diligence, and we
8 liked the Leadership Team of the family that owned
9 it, which is Jon Bloch, really, was the President,
10 and we decided to buy it.
11 BY MS. HENRY:
12    Q.   Did Chefs' Warehouse analyze the salaries
13 of incoming Leadership Teams or Management Teams when
14 it acquires a company to ensure alignment between
15 Chefs' Warehouse and the acquired company?
16    A.   Yes.  Human Resources is part of the
17 analysis of a buying a company, so they do dig into
18 the records of a company.
19    Q.   Are you aware that middle management men
20 from Michael's Meats made the same salary as Cathy
21 Henry?
22    A.   No, I do not know that.
23    Q.   Did Pat O'Callaghan ever tell you that
24 Cathy Henry raised the concern that middle management

21 (Pages 78 - 81)

CONFIDENTIAL

Page 82

1  men from Michael's Meats made the same amount of
2  money as she did?
3      A.   I -- I do not recall such a conversation.
4      Q.   Would that be the type of conversation
5  that you would expect Pat O'Callaghan to have with
6  you?
7      A.   I depend on Pat O'Callaghan to oversee a
8  billion dollars of sales and make the right decisions
9  on a day to day basis, or else I could never run the
10  company having conversations about every --
11  everything that goes on day to day at Chefs'.
12      Q.   So you don't have an expectation that if a
13  Regional Vice President raises a concern about pay
14  equity to Pat O'Callaghan that he would let you know
15  that that concern had been raised?
16      A.   I have the expect --
17      MR. LOOBY:  Objection to form.
18  BY THE WITNESS:
19      A.   Yes.  I have the expectation that he is
20  going to do equitable -- I think Pat O'Callaghan is a
21  very respectful human being of high integrity, and
22  he's going to do his best to make sure that we run a
23  very equitable company.  A lot of times when we buy
24  companies we inherit a lot of things that are not in

Page 83

1  our practices, and it does take time to right size
2  them or figure them out.  Most companies that we do
3  buy there's tremendous change in management.  It's
4  usually why companies are sold.  And while we're
5  changing management, we bring them more into our
6  vision and into our -- into what we expect and how we
7  expect our leadership to run the business.
8  BY MS. HENRY:
9      Q.   What role does Mike Behan play in Chefs'
10  Warehouse today?
11      A.   I do not know his title.  I am not that
12  close to it.
13      Q.   If you don't know his title, what do you
14  think he does?
15      MR. LOOBY:  Objection to form.
16  BY THE WITNESS:
17      A.   Yeah.  I know he was in sales.
18  BY MS. HENRY:
19      Q.   Is he a rank and file salesperson?
20      A.   I believe not, no.  I know that he was in
21  sales, and he took a new position a while back, you
22  know.  Since Covid hit, I have not had a chance
23  really to visit many of our companies.  So now that
24  I'm getting back on the road, I'll have a chance to

Page 84

1  start to visit all our operating companies and be
2  much more -- have much more information, really, on
3  rank and file.  But right now, again, the way we run
4  the company, my direct -- I have too many direct
5  reports as it is, and I depend on leadership to run
6  the day to day.
7      Q.   So you said that you know that he took a
8  new position a while back.
9          What was the new position that you know
10  that he took?
11      A.   I don't know the title.  He reports, I
12  imagine, into the region, and that region reports up
13  to the leader of the Northeast.
14      Q.   And who's the leader of the region?
15      A.   I imagine it rolls up all under Pat
16  O'Callaghan.  There may be somebody in between them,
17  underneath them, but it's not a direct report to me,
18  so I wouldn't know exactly if that -- if that is
19  happening.
20      Q.   Do you know when he took -- You said he
21  took a new position a while back.
22          What else do you know about that?
23      A.   I know that there's constantly changes
24  happening as we acquire companies, and it's something

Page 85

1  that happens, you know, all the time at Chefs'.
2      Q.   So as part of the constant nature of
3  change, you know that Mike Behan's job changed.
4          What else do you know about that?
5      MR. LOOBY:  Objection to form.
6  BY THE WITNESS:
7      A.   Again, he's -- He's not a direct report.
8  He is not an executive in my circles, so I don't keep
9  tabs.
10  BY MS. HENRY:
11      Q.   Whose circle is he in?
12      A.   He's got to be in the circle of the
13  territory that he works in, and there's layers of
14  executives above that manage territories.
15      Q.   Whose in charge of Chefs' Chicago?
16      A.   So the way the company is broken up, it's
17  got operational leaders and it's got sales leaders,
18  and it's kind of complicated and it's bifurcated.  So
19  I don't know if you want me to spend an hour to try
20  to explain all the layers of how they operate between
21  protein companies and now we have seafood companies
22  and it's very intermixed.
23      Q.   Who's in charge of sales in Chicago?
24      A.   I would have to ask Pat O'Callaghan.

22 (Pages 82 - 85)

CONFIDENTIAL

Page 86

1    Q.   You don't know who's in charge of sales in
2  Chicago?
3    A.   I do not -- I do not micromanage.
4    Q.   No, I didn't ask if you micromanage.
5         Do you know who's in charge of sales in
6  Chicago?
7    A.   No.
8    Q.   Who's in charge of operations in Chicago?
9    A.   I can't remember his name.
10   Q.   Is there anything that might refresh your
11  recollection as to his name?
12   A.   It's just not something that -- it's not
13  my job.
14   Q.   Whose job is it?
15   A.   My management.
16   Q.   And who's the manager in charge of
17  Chicago?
18   A.   Again, it's a bifurcated structure that
19  reports up into a Regional Manager that would report
20  up in to the Manager of the Northeast. Right now we
21  have a -- still have an opening in Operations, so
22  I think people are sharing responsibilities.
23   Q.   Who replaced Cathy Henry?
24   A.   I don't believe she was replaced.

Page 87

1    Q.   Who's doing the work that Cathy Henry was
2  doing?
3    A.   I'm assuming it's divided up. Right now I
4  do know that we are shorthanded.
5    Q.   Who -- Do you know who oversees the
6  division of Cathy Henry's former responsibilities?
7    A.   No.
8    MR. LOOBY: Objection to form.
9  BY THE WITNESS:
10   A.   No. But I know it rolls up into Mr. Pat
11  O'Callaghan as the Director of the Northeast.
12  BY MS. HENRY:
13   Q.   Do you have a posting on the street for a
14  Regional Vice President to replace Cathy Henry?
15   A.   I don't know.
16   MR. LOOBY: Objection to form.
17   THE WITNESS: Yeah.
18   MR. LOOBY: You can answer the question.
19  BY THE WITNESS:
20   A.   I wouldn't know that.
21  BY MS. HENRY:
22   Q.   Are you concerned that there's a lack of
23  leadership in sales in Chicago?
24   A.   I'm -- I'm -- I'm concerned about

Page 88

1  everything every day for the whole company
2  unfortunately. So it's not something that is on my
3  radar as something that would be outstanding. We
4  just recently bought two companies coming out of
5  Covid, and there's no shortage of 20-hour days right
6  now for us.
7    Q.   Have you talked to Pat O'Callaghan about
8  the impact of Cathy Henry's departure from Chefs'
9  Warehouse Chicago?
10   A.   We spoke about it, and Ms. Henry was --
11  was let go. But it's not a topic in any recent
12  conversations. We have a lot of other issues in
13  other regions that are dominating the conversation.
14   Q.   Do you know who John Codilis was or is?
15   A.   I know the name, sure. I believe when I
16  spent more time in Chicago, he was part of Cathy
17  Henry's team, and I believe he worked for a specialty
18  food company -- I think that's why I remember his
19  name -- that we tried to buy many years ago.
20   Q.   Did you know what his title was when he
21  worked for Cathy?
22   A.   I think he was one of her sales leaders.
23   Q.   Do you know how many sales leaders she
24  had?

Page 89

1    A.   I don't recall because we did -- we did
2  the acquisition of MT, and I think that kind of fogs
3  her org chart that I remember. They went from a very
4  small business to a more mid-sized business with the
5  acquisition. And I think that gave her a lot more
6  people and -- I don't know who -- who she named as
7  her Leadership Team. I know it was constantly
8  changing. Some people left. Some people, I guess,
9  were recruited.
10   Q.   What did you observe about John Codilis'
11  role on Cathy's team?
12   A.   I'm sorry?
13   Q.   What did you observe about John Codilis'
14  role on Cathy's team?
15   A.   Again, when I -- When I visit a -- an
16  operation, I mean, I'm a -- cheerleader. You know,
17  obviously I want everybody to be successful so the
18  company is successful. You know, my -- My recall of
19  him, he was affable. I know he came from the
20  industry, and pleasant. So I think Cathy would know
21  more than I do, you know, his results.
22   Q.   Do you know if he still works for Chefs'
23  Warehouse?
24   A.   I do know that he does not work for Chefs'

23 (Pages 86 - 89)

CONFIDENTIAL

Page 90

1 Warehouse.
2     Q.   What do you know about that?
3     A.   That's about all I know.
4     Q.   How do you know that?
5     MR. LOOBY:  Objection to form.
6 BY THE WITNESS:
7     A.   A time and place maybe I had -- More of my
8 time maybe was focused on the Midwest.  You know, I
9 go from -- I go from territory to territory as I'm
10 needed.  You know, we're very inquisitive.  We
11 purchase about four companies a year.  So there's a
12 lot of moving parts.  So there's times when I'm
13 involved more in the Midwest or the West or the South
14 and -- You know, as soon as Covid -- As Covid
15 dissipates, I start to travel a lot, so I'm in and
16 out of the ops post.
17 BY MS. HENRY:
18     Q.   So how do you know that John Codilis
19 doesn't work for Chefs' Warehouse anymore?
20     A.   I must have been involved more at the time
21 with Cathy and heard his name a lot.
22     Q.   Do you recall anything that you heard
23 (inaudible) John Codilis from Cathy?
24     MR. LOOBY:  Can you repeat the question,

Page 91

1 Counsel.  I couldn't hear.  It broke up.
2 BY MS. HENRY:
3     Q.   Do you recall anything that you heard
4 about John Codilis from Cathy?
5     A.   I am sure I heard many, many things.  I
6 don't recall specifics.  It was -- It was a long time
7 ago, so ...
8     Q.   So when I asked you how you know he
9 doesn't work for Chefs' Warehouse anymore, you
10 answered time and place.
11         What does that mean?
12     A.   It means that at the time I -- I might
13 have been interim overseeing the territory that I did
14 not have a senior manager, and more involved with
15 talking to Cathy.  So it was a time and a place where
16 I was more involved.
17     Q.   So do you believe that you were overseeing
18 Cathy Henry and Chicago when John Codilis left Chefs'
19 Warehouse employment?
20     A.   I believe at the time I was doing my best
21 to give Cathy as much support as possible.
22     Q.   What -- And how does that pertain to John
23 Codilis' employment at Chefs' Warehouse?
24     A.   It has no pertinence.  I do not -- I do

Page 92

1 not make decisions.  I do not micromanage.  I
2 don't -- I -- I only fire senior leaders.  I don't
3 get involved in day-to-day decisions to let go of
4 people at that level.
5     Q.   So you believe John Codilis was fired?
6     A.   I did not say that.  I said that I don't
7 know.  I know that he was with us.  And I know that
8 at the time and place I know that he left the
9 company.
10     Q.   But you -- I'm sorry.  I'm confused.  Help
11 me understand what support you believed Cathy Henry
12 needed when it came to John Codilis' employment?
13     A.   That I had no -- My -- My role was to
14 support Cathy Henry to get her the funds needed to
15 run her business and make sure she had the tools to
16 be successful.
17     Q.   Are you aware that Pat O'Callaghan
18 terminated John Codilis' employment without Cathy
19 Henry's knowledge?
20     A.   No.
21     Q.   Are you aware that John Codilis'
22 employment was terminated?
23     MR. LOOBY:  Objection.  This was already asked
24 and answered.

Page 93

1 BY THE WITNESS:
2     A.   I -- I do not remember how John Codilis
3 left the company.
4 BY MS. HENRY:
5     Q.   But is it fair to say that you recall that
6 there was something about that story that entailed
7 your support for Cathy Henry?
8     A.   I recall --
9     MR. LOOBY:  Objection to form.
10 BY THE WITNESS:
11     A.   Yes.  I recall that I tried to be as
12 supportive as possible to Cathy Henry.  I root for
13 all my leaders to be successful.  That's my job.  I
14 would not have the job.
15 BY MS. HENRY:
16     Q.   I'm trying to understand why you believed
17 Cathy Henry needed support when it came to John
18 Codilis' employment?
19     A.   I did not say that.  I did not -- I did
20 not -- I was not there to give her support for a
21 particular employee.  What I was saying is that my
22 job was to support Cathy Henry to make sure that she
23 got the support of the corporate office for funding,
24 for projects, and everything from technology to run

24 (Pages 90 - 93)

CONFIDENTIAL

Page 94

1 her business.
2     Q.   Did Pat O'Callaghan ever tell you that he
3 had made the decision to terminate a Sales Manager
4 without consulting a Vice President?
5     A.   I do not recall.
6     Q.   Did Pat O'Callaghan ever tell you that he
7 terminated John Codilis' employment?
8     A.   I do not recall.
9     Q.   Did Pat Lecouras ever tell you John
10 Codilis had left Chefs' Warehouse's employment?
11     A.   I do not recall.
12     Q.   But you know that John Codilis no longer
13 works for Chefs' Warehouse; is that right?
14     MR. LOOBY:  Objection.  This has been asked at
15 least four times already.
16 BY THE WITNESS:
17     A.   John Codilis was not a Senior Vice
18 President or anybody in my realm of direct reports.
19 So this is, I imagine years ago.  I don't know how it
20 pertains to me to recall John Codilis.
21 BY MS. HENRY:
22     Q.   Do senior -- Do region -- Let me begin
23 again.
24         Do Regional Vice Presidents at Chefs'

Page 95

1 Warehouse have the authority to choose their Sales
2 Managers?
3     A.   I would have -- I would -- assume
4     THE REPORTER:  You froze, Mr. Pappas.  Can you
5 say that again, please.
6 BY THE WITNESS:
7     A.   I said I would assume a senior person in
8 charge of sales bills their teams.
9 BY MS. HENRY:
10     Q.   And would you assume that a senior person
11 in charge of sales, like a Regional Vice President,
12 would have the authority to decide whether to
13 terminate --
14     A.   I would assume -- I would that a executive
15 above them who had a different opinion, I could see
16 there being a -- a clash of opinions and maybe the
17 senior person wins the outcome, like in most
18 businesses.
19     Q.   In a scenario like the one that you just
20 described, would you expect the senior person who
21 wins the outcome to confer with the junior person who
22 does not win the outcome?
23     A.   I -- I would assume that people -- all my
24 people work together to try to push the company

Page 96

1 forward and have the best outcome.  Is it a perfect
2 world?  No.  Do we try our best?  Yes.  But we are --
3 we are going down to really granular levels that --
4 Again, I wish I had 24 hours extra in every day.  But
5 these -- I mean, these are hypotheses that, you know,
6 every business faces every single day in management.
7 There's not a day that goes by that there's not
8 conflict and disputes and difference of opinions in
9 every business that we own.
10     Q.   Have you told me all that you know about
11 John Codilis' employment at Chefs' Warehouse?
12     MR. LOOBY:  Objection to form.  I think we've
13 already run down this topic.
14     THE WITNESS:  Is there another question for me?
15 I'm sorry.
16 BY MS. HENRY:
17     Q.   Have you told me all that you know about
18 John Codilis' employment at Chefs' Warehouse?
19     MR. LOOBY:  Same objection.
20 BY THE WITNESS:
21     A.   I don't know -- I don't know what I'm
22 supposed to recall about John -- John Codilis that's
23 important to this examination of Cathy Henry
24 violating a policy and unfortunately exited the

Page 97

1 company.  I'm -- John Codilis was an employee at the
2 time.  I met John Codilis.  I don't have anything --
3 I don't have bad memories of John Codilis, so I don't
4 know what else to say.
5 BY MS. HENRY:
6     Q.   Have you told me everything that you know
7 about Mike Behan's position with Chefs' Warehouse?
8     MR. LOOBY:  Objection to form.
9 BY THE WITNESS:
10     A.   I know Mike Behan.  I met Mike Behan when
11 we -- when we bought Michael's.  I know Mike Behan
12 changed roles, okay, in the company.  I am  not an
13 Mike Behan does not report to me.  He is not an
14 Executive Vice President in my circle that reports to
15 me.  So, again, I don't know what else I'm supposed
16 to tell you about Mike Behan.
17 BY MS. HENRY:
18     Q.   Do you know to whom Mike Behan does
19 report?
20     A.   Do I know who Mike Behan --
21     MR. LOOBY:  Can you repeat that question,
22 Counsel.  I'm sorry.  It cut out.
23 BY MS. HENRY:
24     Q.   Do you know to whom Mike Behan does

25 (Pages 94 - 97)

CONFIDENTIAL

Page 98

1 report?
2    A.   No.  I don't know -- I don't know the
3 complete structure of -- of that region.  I think
4 it's constantly changing because of our growth.  So I
5 would not want to give you a wrong answer.
6    Q.   How do you know who to hold responsible
7 for Chefs' Warehouse Chicago's performance?
8    A.   How do I know what?
9    Q.   Who to hold responsible for Chefs'
10 Warehouse performance, Chicago?
11    MR. LOOBY:  Objection to form.
12 BY THE WITNESS:
13    A.   It's part of a region.  Pat O'Callaghan is
14 responsible for the region.
15    MS. HENRY:  All right.  I'm at a good natural
16 break point in my outline.
17        So do you want to take what might be
18 construed as an early lunch break?
19    MR. LOOBY:  Yeah.  Maybe 30 minutes.  Report
20 back at around 12 Central.
21    MS. HENRY:  Fine.
22    THE VIDEOGRAPHER:  We're going off the record.
23 Time on the monitor, 11:30 a.m.
24

Page 99

1         (WHEREUPON, WE WERE OFF THE
2         RECORD.)
3    THE VIDEOGRAPHER:  We're back on the record.
4 Time on the monitor, 12:25 p.m.
5 BY MS. HENRY:
6    Q.   Why was Catherine Henry terminated from
7 Chefs' Warehouse?
8    A.   I'm sorry.  One more time.
9    Q.   Why was Cathy Henry terminated, her
10 position as Regional Vice President at Chefs'
11 Warehouse?
12    A.   (Technical difficulties)  For violating
13 one of our -- our main politics.
14    THE VIDEOGRAPHER:  Looks like we have two audio
15 sources.  Okay.  I think it was just taken care of.
16 Can we hear you say something now, Mr. Pappas.
17    THE WITNESS:  Yes.
18 BY THE WITNESS:
19    A.   For violating one of our top policies for
20 all executives.
21 BY MS. HENRY:
22    Q.   And which policy was that?
23    A.   The insider trading.
24    Q.   What is -- Before we look at that policy.

Page 100

1        What is your understanding of what the
2 policy covers and prohibits?
3    A.   So it's -- Again, and there's extensive
4 training which is why it was such a surprise to me
5 that she violated the policy.  But basically, you
6 know, every -- especially the circle, the C-Suite and
7 all our executives know that you've got to go through
8 Legal if you -- if you're going to sell any stock,
9 you need permission because of all the SEC rules of
10 closed windows.  And it's so scrutinized today that
11 it's so important to make sure that everybody follows
12 the guidance.
13    Q.   When you say C-Suite, what are you
14 referring to?
15    A.   All executives, anybody who gets stock,
16 anybody who's part of our -- our LTIP who
17 participates in stock rewards as part of their
18 compensation.
19    Q.   About how big a group is that?
20    A.   I would say less than 40.
21    Q.   Is there a list of employees who are part
22 of the C-Suite or participate in the LTIP?
23    A.   I'm sure there is.
24    MR. LOOBY:  Objection -- Objection to form.

Page 101

1 BY THE WITNESS:
2    A.   I'm sure there is.
3 BY MS. HENRY:
4    Q.   And do you know whether Chefs' Warehouse
5 notifies individuals who are on the list of employees
6 who are part of the C-Suite or LTIP?
7    A.   It's -- It's part of their annual trading.
8 It's highly emphasized in their training.  It's very,
9 very well spelled out that everybody who gets stock
10 knows the policy.
11    Q.   How does Chefs' Warehouse (inaudible) that
12 everybody who gets stock knows the policy?
13    A.   Can I -- One more time.  I'm sorry.  I
14 didn't hear you.
15    Q.   How does Chefs' Warehouse ensure that
16 everyone who gets stock knows the policy?
17    A.   You can only do what you can do.  It's
18 part of the training, and it's every year they go
19 through training, and they sign off that they
20 understand the policies.
21    Q.   Does the training include designating
22 individual subjects to the policy?
23    MR. LOOBY:  Objection to form.
24

26 (Pages 98 - 101)

CONFIDENTIAL

Page 102

1  BY THE WITNESS:
2      A.   It's -- It's -- It's completely
3  encompassing.  I mean, I go through the training.  I
4  mean, it's -- It's grueling.  It's -- It's what we
5  have to do as a public company.
6  BY MS. HENRY:
7      Q.   Does the training entail designating
8  individuals that they are covered by the policy?
9      MR. LOOBY:  Again, objection to form.
10 BY THE WITNESS:
11     A.   Every individual who takes the training
12 signs that they understand and have taken the
13 training and understand the policies.
14 BY MS. HENRY:
15     Q.   So the training does not designate
16 individuals who are covered by the policy?
17     MR. LOOBY:  Objection to form.  Asked and
18 answered.  Mischaracterizes the witness' testimony.
19 BY THE WITNESS:
20     A.   All executives of the company must take
21 the class, and they sign off that they understand the
22 policies.
23 BY MS. HENRY:
24     Q.   Mr. Pappas, I'm sharing my screen and hope

Page 103

1  that you can see what I have marked.
2      A.   Yep.
3      Q.   This is marked as Exhibit No. 8, which --
4      MS. HENRY:  I apologize, Madam Court Reporter, I
5  don't believe that we are at Exhibit No. 8 in this
6  deposition, but it was marked for a previous
7  deposition, and for reason known only to technology
8  it didn't change, but here we are.
9  BY MS. HENRY:
10     Q.   So, Mr. Pappas, can you see what I have
11 marked -- what is marked as Exhibit No. 8?
12     A.   I'm -- I'm seeing a form on my screen, so
13 I imagine that's Exhibit No. 8.  It doesn't say
14 Exhibit No. 8.
15     Q.   Okay.  I'll scroll down so that you can
16 see it.
17         Do you see the sticker?
18     A.   Yes, I do.
19     Q.   So what does Exhibit No. 8 appear to be to
20 you?
21     A.   It's our Insider Trading Policy.
22     Q.   Okay.
23     MS. HENRY:  Oh, it says -- It's interesting
24 because it says Exhibit No. 4 up in the corner of the

Page 104

1  screen there.  Very odd.
2      MR. LOOBY:  It -- Melissa, maybe -- I don't know
3  if you added the little -- clicked the button to add
4  the sticker.  Maybe that's -- that's why.
5      MS. HENRY:  Maybe I didn't.  Maybe I didn't.
6  Thank you.  And maybe I'll go back and correct it for
7  clarity.  Maybe I won't.  Okay.  Well, I will make
8  sure that the next one is right and -- Okay.
9      MR. LOOBY:  We can just represent on the record
10 that this was, I believe, Exhibit 8 in Ms. Henry's
11 deposition, and then you can just number as you see
12 fit on the others.
13     MS. HENRY:  Okay.
14     THE REPORTER:  I'm -- I'm sorry.  So we have it
15 marked Exhibit 4.
16     MS. HENRY:  Yeah, it's marked Exhibit 4 in the
17 Veritext.
18     THE REPORTER:  And that's the way it's going to
19 be for his deposition?
20     MS. HENRY:  Yes, please.
21     THE REPORTER:  Okay.  All right.
22     MS. HENRY:  Thank you, Ms. Gordon.
23     MR. LOOBY:  I'm sorry, Melissa, did -- did you
24 also scroll to the bottom of the -- of the last page

Page 105

1  in this exhibit for the witness?  I was looking off.
2  I might not have seen that.
3      MS. HENRY:  I did not.  I would be happy to.
4      MR. LOOBY:  Please do.
5      MS. HENRY:  While I do that, I'm going to add
6  the stamps since I'm having to re-show it anyway.
7  Now it's showing 4.  Nope, let me not do that.  Let
8  me put -- Okay.  I'm correctly numbering this as
9  Exhibit 4, and I'm going to add, and I'm going to
10 introduce it.
11 BY MS. HENRY:
12     Q.   Okay.  Mr. Pappas, are you able to see
13 what is on the screen now correctly marked as
14 Exhibit No. 4?
15     A.   Yes.  It's -- The writing is small, but I
16 think I can make it out.
17     MR. LOOBY:  Would you mind scrolling to the end,
18 Melissa, on this exhibit, please, just so the witness
19 can see the whole document.
20     MS. HENRY:  Certainly.
21 BY MS. HENRY:
22     Q.   Okay.  Have you had an opportunity to
23 review what has been marked as Exhibit No. 4,
24 Mr. Pappas?

27 (Pages 102 - 105)

CONFIDENTIAL

Page 106

1    A.   Yes.
2    Q.   Okay.  Mr. Pappas, can you see a document
3 on your screen now?  And I will --
4    A.   Yes, I can.
5    Q.   And it is marked as Exhibit No. 5.  I will
6 scroll to the end of Exhibit No. 5.
7         Have you had an opportunity to review
8 Exhibit No. 5 or to take a look at it?  I know you
9 haven't had --
10   A.   Yes, I have.
11   Q.   What does Exhibit No. 5 appear to be?
12   A.   It's a -- extension of our -- our policy
13 on insider trading.
14   Q.   Why do you characterize it as an
15 extension?  How do you know that it's an extension?
16   A.   Well, you're scrolling through it, so I
17 can't see everything at once.  So I'm imagining it's
18 all part of the -- adopted by the Board resolutions
19 of the insider trading policy.
20   Q.   Okay.  But is your -- your assumption that
21 it is an extension based on the date of this policy?
22   A.   No.  I just thought you were scrolling
23 through the same policy.  My mistake.
24   Q.   So I've shown you Exhibits 4 and 5.

Page 107

1         Do you know what the difference between
2 Exhibits 4 and 5 is?
3    A.   Granularly, no.
4    Q.   How about broadly?
5    A.   I imagine it's just a -- maybe a slightly
6 modified version of the original document.  You know,
7 our lawyers are always constantly upgrading it,
8 obviously, to make it a better document.
9    Q.   So do -- Are you aware of any difference
10 between the policies articulated in Exhibit 4 and
11 Exhibit 5?
12   A.   Nothing that would change the -- the
13 policy of holding people accountable for following
14 policy in their training.  I mean, we all take -- We
15 all take the training class.  We all sign the policy.
16   Q.   Did the company train on the differences
17 between Exhibit 4 and Exhibit 5?
18   A.   That I don't know.
19   MS. HENRY:  (Undecipherable) This is -- In
20 person it's secure.  It's cumbersome to flip between
21 the screens, and I apologize.
22 BY MS. HENRY:
23   Q.   Do you see what we have talked about as
24 Exhibit 5 then?

Page 108

1    A.   I -- I see Exhibit 5, yes.
2    Q.   Okay.  You see an arrow on the page -- on
3 Exhibit 5?
4    A.   Yes.
5    Q.   Can you read the first -- the -- the
6 section of the policy that begins with the arrow with
7 Pre-Clearance Procedures, please?
8    A.   "The persons designated by the Compliance
9 Officer as being subject to these procedures, as well
10 as the Family Members and Controlled Entities or such
11 persons, may not engage in any transaction in Company
12 Securities without first obtaining pre-clearance of
13 the transaction from the Compliance Officer."
14   Q.   Okay.  Thank you, Mr. Pappas.
15        Would you agree that that sentence
16 describes a specific action that is designation by
17 the Compliance OFFICER?
18   A.   I think it's general --
19   MR. LOOBY:  Objection to form.
20        I'm sorry.  You can go ahead.
21 BY THE WITNESS:
22   A.   Yeah, it's all encompassing.  We take the
23 class every year.  So all executives -- I mean,
24 executives trade stock all the time.  They know it's

Page 109

1 a simple phone call into the Legal Department.  They
2 can ask a question.  It hits my desk many times.
3 Executives are -- are -- want to trade stock.  So
4 it's -- That's why we take the class.
5 BY MS. HENRY:
6    Q.   Does the pre-clearance procedure --
7    A.   And you can ask a question.
8    Q.   I'm sorry, sir.  I interrupted you.
9    A.   Yeah, that's everybody -- All exec --
10 Again, we're a small team.  So everybody knows to ask
11 the question.  If you have a question, you ask the
12 question when in doubt.  It's such a serious offense,
13 insider trading.  That's why we spend the money and
14 do the training every year because we know how
15 important it is.
16 BY MS. HENRY:
17   Q.   So does the Compliance Officer designate
18 persons subject to the procedures?
19   MR. LOOBY:  Objection to form.
20 BY THE WITNESS:
21   A.   All executives.
22 BY MS. HENRY:
23   Q.   Does the Compliance Officer designate
24 persons subject to the procedures?

28 (Pages 106 - 109)

CONFIDENTIAL

Page 110

1     MR. LOOBY:  Objection to form.
2  BY THE WITNESS:
3     A.   Yeah.  Any question goes to the General
4  Counsel.  It's -- It's kind of our DNA, you know.
5  It's done constantly.  I don't want to say every day.
6  But all executives who take the training class under
7  that anything you -- if you want to trade stock, you
8  call the General Counsel's office.
9  BY MS. HENRY:
10    Q.   So is there any mechanism for enforcement
11  of the insider trading policy that those who are a
12  part of the DNA know about?
13    MR. LOOBY:  Objection to form.
14  BY THE WITNESS:
15    A.   You know, it's -- It's self -- It's
16  self-reporting, really.  You know, it's up to the
17  responsibility, you know, of the executive, okay, to
18  report.  And, you know, again, that's why we take the
19  class.  If you have any doubt, you pick up the phone
20  and you ask the question.
21  BY MS. HENRY:
22    Q.   Does the policy talk about taking the
23  class to know whether the Compliance Officer has
24  designated persons subject to the pre-clearance

Page 111

1  procedures?
2     MR. LOOBY:  Objection to form.
3  BY THE WITNESS:
4     A.   The -- The class training is so clear.
5  Anybody who takes the class -- Again, I don't want to
6  insult anybody.  But you take the class.  You know,
7  you have to get clearance to sell stock.  It's --
8  It's -- It's black and white in training.  And
9  anybody who has a question asks the question.  We've
10  had many people call and ask the question because
11  they want to be a hundred percent sure.  It has the
12  contact information for questions in the training
13  manual.  It's pretty black and white, which is why my
14  hand was forced to terminate Ms. Henry.  It's not
15  something that I wanted to do.  It's -- Unfortunately
16  I was -- It was not something I was happy I had to
17  do.  Unfortunately it was something I had to do.
18  BY MS. HENRY:
19    Q.   Was Ms. Henry designated by the Compliance
20  Officer as a person subject to pre-clearance
21  procedures?
22    A.   All executives.
23    Q.   Was Ms. Henry designated by the Compliance
24  Officer?

Page 112

1     A.   All executives are designated.
2     Q.   How does Chefs' Warehouse track compliance
3  with the insider trading policy?
4     A.   How do we check compliance?
5     Q.   Track.
6     A.   How do we track?
7     Q.   Yes, sir.
8     A.   You know, again, I mean, for the Executive
9  Team it's not that big, okay.  But it's -- AST is
10  self-policing, you know.
11    Q.   I don't know.
12         How is AST self-policing?
13    A.   The exact mechanism from AST -- I mean, we
14  get reports of who's trading our stock from AST.
15    Q.   And then what do you do with the report of
16  who's trading your stock from AST?
17    A.   Well, I get -- It's reviewed by General
18  Counsel, so -- I mean -- That's why it's -- I mean,
19  if you do it, that's why you ask permission to do it
20  and that's why we only pay certain people, you know,
21  who participate who are at the level to understand
22  policies that they're getting -- you know, they're
23  getting a very valuable asset in the stock of the
24  company, and there's rules that we all have to

Page 113

1  follow.
2     Q.   So what does the General Counsel do with
3  the report that -- Does the General Counsel receive a
4  report from AST?
5     A.   I think it --
6     MR. LOOBY:  Objection to form.
7  BY THE WITNESS:
8     A.   Yeah, it goes through Human Resources.
9  And if there's a red flag, it goes to General
10  Counsel.
11  BY MS. HENRY:
12    Q.   And how often does that happen?
13    A.   Well, this has never happened.  I mean,
14  there's people that call and they're in the wrong
15  period, and we tell them that you can't trade your
16  stock, you have to wait till an open window.  But no
17  executive has ever violated the policy.
18    Q.   And how do you -- How do you know that no
19  executive has ever violated the policy?
20    A.   Because AST -- HR -- It would be reported
21  to Human Resources that there was a trade, and
22  everybody is very well trained in it.
23    Q.   So Human Resources receives a report of
24  every trade from AST?

29 (Pages 110 - 113)

CONFIDENTIAL

Page 114

1    A.    I'm not a hundred percent of how they
2 know.  But they do receive a report of everybody
3 who's paid in stock.  So every executive who gets
4 stock as part of their compensation package, yes,
5 AST -- Human Resource does get that report.
6    Q.    Does AST regularly receive a report --
7 Does Human Resources regularly receive a report from
8 AST of everyone who trades Chefs' Warehouse stock?
9    A.    Executives does.
10    MR. LOOBY:  Objection to form.  Objection to
11 form.
12        You can answer the question.
13 BY THE WITNESS:
14    A.    Yes.  For those who are paid in stock,
15 yes.
16 BY MS. HENRY:
17    Q.    And what does Human Resources do with the
18 report it receives from AST of those who are paid in
19 stock and who have sold stock?
20    A.    If there's no red flag, I guess there's
21 not a lot to do.
22    Q.    And what constitutes a red flag?
23    A.    That you can't receive clearance from our
24 Compliance.

Page 115

1    Q.    And how does Human Resources know who has
2 received clearance from your Compliance?
3    A.    Well, Human Resource and Compliance are
4 hand in hand to run a company.  So they understand
5 each other's roles and work hand in hand to ensure
6 the policies are enforced.
7    Q.    So this -- So is there a mechanism --
8    MR. LOOBY:  Objection to form.  Asked and
9 answered.
10 BY THE WITNESS:
11    A.    Yeah, I mean, the -- Yeah, so --
12    MS. HENRY:  I didn't even get the question --
13        Excuse me.
14        I started the sentence is there a
15 mechanism.  I didn't finish the question.  You
16 objected to the form without knowing what the
17 question was.
18    MR. LOOBY:  I'm sorry.  There was a delay on my
19 video feed, so I thought you were done with the
20 question.  Go ahead and finish it, please.
21 BY THE WITNESS:
22    A.    Yeah.  HR--
23 BY MS. HENRY:
24    Q.    Is there --

Page 116

1    A.    Yeah.  HR and General Counsel's Department
2 work hand in hand.  Obviously there's no perfect
3 world.  But this is such an important policy, people
4 go to jail for it, that -- that's why we pay so much
5 attention, and we make everybody take the class and
6 sign it, because we don't want anybody to go to jail,
7 and we don't want the company and the SEC coming down
8 on us and our shareholders getting upset, and -- it's
9 just a strong violation that they work very closely
10 together on this.
11    Q.    So does HR have a mechanism for checking
12 with the Compliance Officer when --
13    A.    Correct.
14    Q.    How does that work?
15    A.    She either goes down to his office or
16 picks up the phone and say, you know, Fred Smith
17 wants to sell a hundred shares, are they cleared?
18    Q.    Is that what happened in this case, did
19 Pat Lecouras say Cathy Henry wants to sell shares, is
20 she clear?
21    A.    No, because she didn't go through
22 Compliance.  So it happened after the fact.
23    Q.    Tell me everything that you know about
24 what happened after the fact?

Page 117

1    MR. LOOBY:  Objection to the form of the
2 question.
3 BY MS. HENRY:
4    Q.    What do you know about Cathy Henry's sale
5 of Chefs' Warehouse stock?
6    A.    I know that she did not follow the policy.
7 She did not get clearance.  It was after the fact we
8 found out.  It could have put us in a horrible
9 situation if it was a closed window or if there was
10 something going on.  We're very acquisitive.  That's
11 why the policy is so strongly enforced because we are
12 constantly in M&A.  And for a senior leader to trade
13 the stock without clearance, it's a -- it's a major
14 offense.  And no one feels worse about having to let
15 Cathy Henry go than I did because I had a
16 relationship with Cathy in the past and knew her and
17 respected her, and I basically had no choice, okay,
18 but to let her go for violating one of our top
19 policies that, you know, everybody is trained on.  I
20 mean, there's just no excuses.
21    Q.    What did Pat Lecouras tell you about what
22 she learned from AST about Cathy Henry's sale of
23 stock?
24    A.    The only thing that really mattered was

30 (Pages 114 - 117)

Page 118

1 that she traded stock without receiving clearance.
2 It's -- It's not very complicated.
3    Q.   How did Pat Lecouras learn that Cathy
4 Henry traded stock without receiving clearance?
5    MR. LOOBY: Objection to form, foundation.
6 BY MS. HENRY:
7    Q.   If you know?
8    A.   When she got her AST report and she did
9 her -- I imagine they speak daily with General
10 Counsel and the Compliance Team and the Legal Team --
11 We have obviously thousands of employees, so it's a
12 constant back and forth between Human Resources and
13 Legal, and counsel informed her that there was no
14 clearance, and that's how it hit my desk.
15    Q.   Does Pat Lecouras have a practice of
16 receiving a report of employee stock trades from AST
17 and conferring with the Compliance Officer about that
18 report?
19    MR. LOOBY: Objection to form. Objection to
20 foundation. Asked and answered.
21 BY MS. HENRY:
22    Q.   If you know?
23    A.   I know that Pat Lecouras and the
24 Compliance Team review every -- every trade of an

Page 119

1 executive's who's been granted stock.
2    Q.   And how do you know that?
3    A.   It's our policy.
4    Q.   Where is that policy articulated?
5    A.   Where is that policy written? It's just
6 best practices that we practice in the company.
7    Q.   Are you aware that about 90 percent of the
8 insider trades of Chefs' Warehouse stock are placed
9 by people who work in the corporate office?
10    MR. LOOBY: Objection to form.
11 BY THE WITNESS:
12    A.   No, I do not.
13 BY MS. HENRY:
14    Q.   Did you talk Pat O'Callaghan about Cathy
15 Henry's sale of Chefs' Warehouse stock?
16    A.   I'm sorry. I missed the beginning of the
17 question.
18    Q.   Did you talk to Pat O'Callaghan about
19 Cathy Henry's sale of Chefs' Warehouse stock?
20    A.   I don't recall, but I'm assuming that I --
21 I must have had -- You know, I just don't recall, so
22 I don't want to say anything I don't recall.
23    Q.   Did you talk to Pat Lecouras about Cathy
24 Henry's sale of Chefs' Warehouse stock?

Page 120

1    A.   They spoke to me about Cathy Henry's sale
2 of stock.
3    Q.   Who is they?
4    A.   General Counsel and Pat Lecouras.
5    MR. LOOBY: And I'll just counsel the witness to
6 be careful about disclosing any communications
7 between you and legal counsel.
8    THE WITNESS: Okay.
9 BY MS. HENRY:
10    Q.   The question was did you speak to Pat
11 Lecouras about Cathy Henry's sale of Chefs' Warehouse
12 stock?
13    A.   I don't recall. But that I will assume I
14 must have.
15    Q.   What do you recall about learning about
16 Cathy's Henry -- Cathy Henry's sale of Chefs'
17 Warehouse stock?
18    A.   I'm -- I'm sure most of it is privileged.
19 But I do remember that I was extremely disappointed
20 and upset.
21    Q.   Why do you -- Why are you sure most of it
22 is privileged?
23    A.   Because most of the conversation then went
24 to Legal.

Page 121

1    Q.   Is it your understanding -- By then went
2 to Legal, did Pat Lecouras speak to you about Cathy
3 Henry's sale of Chefs' Warehouse stock?
4    A.   I -- I don't recall if it was Pat Lecouras
5 or at that point it went to the General Counsel's
6 office and they came to see me.
7    Q.   What else did you learn about Cathy
8 Henry's sale of Chefs' Warehouse stock?
9    MR. LOOBY: Object to the form. Asked and
10 answered.
11 BY THE WITNESS:
12    A.   I would -- I would say that the most
13 important things I remember was that -- I was very
14 upset because I understood the consequences, and it
15 was not something I was happy that I had to do.
16 BY MS. HENRY:
17    Q.   When you say had to do, who -- why do you
18 understand that you had to terminate Cathy Henry's
19 employment?
20    A.   I understood I had to take very serious
21 action, and I didn't like my choices and, you know,
22 reprimanding an executive at that level or something
23 it's not something that I believe in. It's -- You
24 have de-motivated employees. It is such a serious

31 (Pages 118 - 121)

CONFIDENTIAL

Page 122

1 policy. I could not set horrible precedence as well.
2 It's very dangerous.
3    Q.   Do you know whether Cathy Henry was ever
4 given an opportunity to explain her conduct?
5    A.   Yes, I do.
6    MR. LOOBY:  Objection to form.
7 BY THE WITNESS:
8    A.   Yes, I do.
9 BY MS. HENRY:
10    Q.   What do you know that Cathy -- What do
11 you -- Tell me what you know about Cathy Henry's
12 opportunity to explain her conduct?
13    A.   I know that they -- I know that it was --
14 she was confronted about she violated the policy of
15 insider trading.
16    Q.   Do you know when she was confronted about
17 violating the policy?
18    A.   No, I don't.
19    Q.   Do you know whether it was during a
20 meeting to terminate her employment?
21    A.   No, I don't.
22    MR. LOOBY:  Objection. Asked and answered. The
23 witness just said he didn't know.
24

Page 123

1 BY THE WITNESS:
2    A.   Yeah, I don't know.
3 BY MS. HENRY:
4    Q.   And what do you understand Cathy Henry
5 said when she was given an opportunity to explain her
6 conduct?
7    A.   I don't recall.
8    Q.   Who confronted Cathy about her conduct?
9    A.   I don't recall.
10    Q.   What is the basis of your testimony that
11 you know that Cathy was confronted with violating the
12 very serious policy?
13    A.   Again, I've never had to experience this
14 because no senior executive ever violated the policy,
15 so -- It was a very uncomfortable time for me, and it
16 was a very hard decision that I had to make, and I
17 probably just wanted to get it over with because it
18 was very uncomfortable and disappointing thing that
19 we had to do.
20    Q.   So how do you know that Cathy Henry was
21 confronted about violating the company policy?
22    A.   Well, she had to be confronted because she
23 had to be terminated for it.
24    Q.   Do you know that she was confronted

Page 124

1 because she was being terminated for it?
2    A.   Well, again, if -- It's been a while,
3 but -- When -- When I told -- When I told the team
4 that she had to be terminated because she violated
5 such an important policy, someone had to go tell her.
6 I imagine it's the person that she reported to.
7    Q.   Do you know who told her?
8    A.   No.
9    Q.   So when you testified a minute ago that
10 you knew that she was confronted about violating the
11 very serious policy, how do you know that she was
12 confronted about -- about violating a very serious
13 policy?
14    MR. LOOBY:  Objection to form. Asked and
15 answered.
16 BY THE WITNESS:
17    A.   Yeah, it was conversation with General
18 Counsel, and I'm sure it's -- it was all privileged.
19    MS. HENRY:  I'm not asking for legal advice, and
20 I'm not asking you to violate the privilege.
21 BY MS. HENRY:
22    Q.   Did you have a conversation with Cathy
23 Henry -- with your attorney about Cathy Henry's
24 opportunity to explain violating a very serious

Page 125

1 company policy?
2    MR. LOOBY:  I'm going to instruct the witness
3 not to ask [sic] that because that would be divulging
4 communications between Mr. Pappas and in-house
5 counsel.
6    MS. HENRY:  With all due respect, Counsel, I
7 didn't ask him to say what the substance of the
8 conversation was. I asked did you have a
9 conversation with your General Counsel about Cathy
10 Henry's opportunity to explain her conduct in
11 violating a very serious company policy.
12    MR. LOOBY:  Mr. Pappas, you can answer whether
13 you had a communication with in-house counsel with
14 respect to issues related to Ms. Henry's violation of
15 the insider trading policy.
16 BY THE WITNESS:
17    A.   Yes, I had conversations with General
18 Counsel.
19 BY MS. HENRY:
20    Q.   And you testified that you know that she
21 was confronted about violating a very serious company
22 policy.
23       And who do you believe confronted Cathy
24 Henry about violating a very serious company policy?

32 (Pages 122 - 125)

CONFIDENTIAL

Page 126

1    MR. LOOBY: Objection to form. Asked and
2 answered.
3        You can answer, if you know.
4 BY THE WITNESS:
5    A.   I hate to assume. But I assumed it was
6 her direct -- who she reported to.
7 BY MS. HENRY:
8    Q.   Who did she report to?
9    A.   Pat O'Callaghan.
10    Q.   Did you ever talk to Pat O'Callaghan about
11 the meeting that he had with Cathy Henry about her
12 very serious violation of company policy?
13    A.   I don't recall. I just recall that I was
14 very upset that I had to do it.
15    Q.   Do you know whether or not Cathy Henry
16 attempted to offer an explanation for her conduct?
17    A.   I don't recall.
18    Q.   Do you know who told Cathy Henry that she
19 was terminated from Chefs' Warehouse employment?
20    MR. LOOBY: Objection. Asked and answered.
21 BY THE WITNESS:
22    A.   I'm assuming it was the her person who she
23 reported to, Pat O'Callaghan.
24

Page 127

1 BY MS. HENRY:
2    Q.   Do you know whether anyone else
3 participated in a conversation with Cathy Henry about
4 terminating her employment?
5    A.   I don't know.
6    Q.   What is the custom at Chefs' Warehouse for
7 terminating an employee's con -- an employee's -- for
8 an individual's employment? What is the custom at
9 Chefs' Warehouse for terminating an individual's
10 employment?
11    A.   What is the cost?
12    Q.   The custom.
13    A.   For terminating?
14    Q.   Yes.
15    A.   What is the custom for terminating?
16    Q.   Yes. Yes.
17    A.   I think that in most situations it's the
18 person that's responsible for that team member has to
19 terminate them.
20    Q.   And do you know whether or not, in fact,
21 that happened in this instance?
22    MR. LOOBY: Objection. Asked and answered at
23 least four times already.
24    THE WITNESS: Yeah.

Page 128

1 BY THE WITNESS:
2    A.   I mean, I hate to assume. But I am
3 assuming it was done by Mr. Pat O'Callaghan.
4 BY MS. HENRY:
5    Q.   Did you ever talk to Pat O'Callaghan about
6 what happened during the meeting when he terminated
7 Cathy Henry's employment?
8    A.   I -- I don't recall. I mean, he knows I
9 was very upset about the situation.
10    Q.   Did Pat O'Callaghan ever tell you about
11 the conversation he had with Cathy when he terminated
12 her employment?
13    A.   I don't recall --
14    MR. LOOBY: Objection to form. The witness said
15 he didn't know that -- who spoke to Ms. Henry about
16 the termination of her employment. So you're
17 assuming something that the witness has just not
18 testified to.
19    MS. HENRY: The witness also testified he
20 assumed that that happened after first saying that he
21 knew that she had an opportunity to explain her
22 conduct. So I'm trying to get at what he knows and
23 what he remembers, what's, you know --
24    MR. LOOBY: Understood. Can you please reask

Page 129

1 the question.
2    THE WITNESS: Yes.
3 BY MS. HENRY:
4    Q.   Did Pat O'Callaghan ever tell you anything
5 about a conversation with Cathy Henry during the
6 meeting when he terminated her employment?
7    MR. LOOBY: I'm just going to object to the
8 form.
9        You can answer.
10    THE WITNESS: Yeah.
11 BY THE WITNESS:
12    A.   Again, it's a while ago. I don't recall.
13 The only thing I -- I do remember was it was a very
14 uncomfortable time. I was very upset that I had no
15 choice in the matter, and I wanted everybody to move
16 on and -- and prosper.
17 BY MS. HENRY:
18    Q.   Including Cathy Henry?
19    A.   Oh, I wished Cathy the best, absolutely.
20 She's talented and -- I think she knows I was fond of
21 her and wanted her to succeed. She's a senior
22 leader. You know, this -- I was blindsided and it
23 was very uncomfortable.
24    Q.   Did you authorize Pat O'Callaghan to offer

33 (Pages 126 - 129)

CONFIDENTIAL

Page 130

1 Cathy Henry $50,000 in exchange for a settlement in
2 release of -- settlement of all claims to Chefs'
3 Warehouse?
4    A.   It was in her contract.  I think we were
5 just following the letter of her contract.
6    Q.   Did you authorize Pat O'Callaghan to offer
7 Cathy Henry $50,000 in exchange for a settlement and
8 release of all claims against Chefs' Warehouse?
9    A.   I mean, I believe that's privileged.  I
10 think that was a conversation with General Counsel.
11   Q.   As the CEO of Chefs' Warehouse, are you
12 the ultimate authority on when and whether the
13 company offer settlement or separation agreements to
14 individuals who leave your employment?
15   A.   As the CEO anything -- anything that has a
16 major impact on the company I am told about.  Of any
17 serious policy break or any serious monetary amount.
18   Q.   Have you heard any description of any
19 explanation that Cathy Henry may have offered for her
20 behavior?
21   A.   I'm -- I don't recall.  But, again, it was
22 a very uncomfortable time.  What was explained to me
23 was basically it was a clear violation and nothing
24 else really at that point could change my decision.

Page 131

1    Q.   But was your decision based solely on the
2 clear violation of the policy?
3    A.   Yes.
4    MR. LOOBY:  Object -- Objection to form.
5         But go ahead and answer it.
6 BY THE WITNESS:
7    A.   Yes.
8 BY MS. HENRY:
9    Q.   Did you -- Strike that.
10   THE REPORTER:  I'm sorry.  Can I ask for a
11 2-minute washroom break, please.
12   MS. HENRY:  Oh, my goodness, of course, please.
13   THE REPORTER:  Okay.  Thank you.
14   THE VIDEOGRAPHER:  Going off the record.  Time
15 on the monitor, 1:13 p.m.
16       (WHEREUPON, WE WERE OFF THE
17            RECORD.)
18   THE VIDEOGRAPHER:  We're back on the record.
19 Time on the monitor, 1:21 p.m.
20 BY MS. HENRY:
21   Q.   So, Mr. Pappas, you've testified a couple
22 of times about how upset you were about the decision
23 that you feel compelled to have made to terminate
24 Cathy Henry's employment.

Page 132

1        Did you do anything to follow up on that
2 decision?
3    MR. LOOBY:  Objection to form.
4        You can answer.
5    THE WITNESS:  Yeah, I don't understand the
6 question though, did I do anything.
7 BY MS. HENRY:
8    Q.   Did you ask anyone who participated in the
9 conversation how it went?
10   MR. LOOBY:  Objection to form.
11 BY THE WITNESS:
12   A.   I -- I don't recall.  I was anxious to
13 move on because, like as I said, I was very fond of
14 Ms. Henry, and it was not a decision that I was happy
15 to make, and I don't recall any other conversations,
16 honestly.  Just I wanted to move on.
17 BY MS. HENRY:
18   Q.   Did you instruct or ask anyone on your
19 Leadership Team to change Chefs' Warehouse training
20 policies to ensure that no employee ever engaged in
21 the same conduct as Ms. Henry again?
22   A.   There's only -- You know, I was wrong.
23 There's not 40 -- There's 20 executives that are part
24 of our LTIP program.  Everybody -- Everybody

Page 133

1 understands the policy.  It's not -- It's no -- It's
2 not that complicated, and it's a small group.  So
3 it's just -- And it's, you know, individual
4 responsibility.  It's stated in there, you know.
5 Nobody likes to sit there and take a training course
6 but they know they have to do it, and it's just
7 crystal clear.  It's not complicated.
8    Q.   So has Chefs' Warehouse changed any of its
9 training or communication about insider trading
10 policy in the wake of Cathy Henry's termination?
11   A.   I don't --
12   MR. LOOBY:  Objection to form.
13       You can answer.
14 BY THE WITNESS:
15   A.   I don't know.  But -- Yeah, I don't know.
16 BY MS. HENRY:
17   Q.   Did you do anything to address how
18 upsetting this incident was for you?
19   MR. LOOBY:  Objection to form.
20   THE WITNESS:  I'm sorry.  I didn't hear the
21 question.
22 BY MS. HENRY:
23   Q.   Did you do anything to address how
24 upsetting this situation was for you?

34 (Pages 130 - 133)

CONFIDENTIAL

Page 134

1    MR. LOOBY: Same objection.
2  BY THE WITNESS:
3    A.   I think my team knew how upset I was, and
4  because I was -- You know, it was something that
5  could have been avoided and, you know -- You know,
6  it's like grieving, I guess, you want to move on, you
7  know, after something bad happens and, you know, we
8  had to move on, you know. Unfortunately the business
9  moves at a very fast pace and, you know, we all move
10 on.
11 BY MS. HENRY:
12   Q.   Did you come to any conclusion about
13 whether or not Cathy Henry knowingly violated Chefs'
14 Warehouse insider trading policy?
15   A.   You know, I take the -- I take the emotion
16 out of decisions like this. Unfortunately it's part
17 of my job. So, you know, I know she violated the
18 policy and, you know, she had the individual
19 responsibility to monitor -- you know, to
20 self-monitor and she didn't do it.
21   Q.   Does Chefs' Warehouse have any employee
22 assistance program or any kind of resources available
23 to individuals who are upset about changes in the
24 work environment?

Page 135

1    MR. LOOBY: I'm going to object to form and to
2  the relevance of this question.
3    But you can answer it.
4  BY THE WITNESS:
5    A.   I mean, we have best practices of any
6  company our size. We have hot lines. We have
7  outreach programs, and Human Resources and General --
8  Our General Counsel's office fields calls all the
9  time. So it's a pretty flat organization in many
10 ways, and everybody has access to information.
11 BY MS. HENRY:
12   Q.   I hate to circle back.
13   But it's a flat organization except for
14 when it comes to Chicago; is that right, because
15 there are many layers between Mike Behan and Pat
16 O'Callaghan?
17   MR. LOOBY: Objection to the form.
18 Argumentative. Misstates the witness' testimony.
19   MS. HENRY: I'm sorry. I'm sorry.
20 BY MS. HENRY:
21   Q.   Is Chefs' Warehouse a flat organization?
22   A.   Well, you know, let's -- Let's define what
23 a flat organization -- I think people have different
24 definitions. When I say flat is that we're a group

Page 136

1  that people are accessible, and you can pick up the
2  phone and you can get information. It's not like
3  Apple or General -- General Electric where there's
4  400,000 employees. So when I say flat, it means that
5  there's access to information. I've never -- I never
6  really heard of -- of anybody not having access to
7  information.
8    Q.   And are you aware whether or not should
9  the commune -- the Executive Vice Presidents within
10 Chefs' Warehouse has a robust communication strategy
11 with their Leadership Team?
12   MR. LOOBY: Objection to the form.
13   THE WITNESS: Yeah.
14 BY THE WITNESS:
15   A.   There's 20 people that get a very
16 precious -- To me giving out stock is an extremely
17 precious bonus of only 20 people. So I assume
18 they're adults. They were hired because they were
19 professional, and they are expected to behave in a
20 professional manner and no their responsibility. So
21 I don't -- I don't think I have anything to say
22 further than that.
23 BY MS. HENRY:
24   Q.   Okay. I have put what we have marked as

Page 137

1  Exhibit 6 on the screen.
2    Mr. Pappas, can you see that?
3    A.   Yes, I can.
4    Q.   Okay. I will scroll through this and give
5  you an opportunity to review it.
6    Have you had an opportunity to review
7  Exhibit No. 6?
8    MR. LOOBY: Counsel, could you please scroll up
9  to the top of the e-mail as well. Thank you.
10 BY THE WITNESS:
11   A.   Yes. It's a note from Human Resources.
12 The topic is What is a Non-Qualified Stock Option,
13 how options work.
14 BY MS. HENRY:
15   Q.   Have you seen this before?
16   A.   Yes, I have.
17   Q.   When have you seen it before?
18   A.   I don't know.
19   Q.   Did you receive this e-mail in 2019?
20   A.   I must have if I was awarded stock
21 options.
22   Q.   Is there anything in this e-mail that
23 tells an employee who is selling a non-qualified
24 stock option that he or she must seek pre-clearance?

35 (Pages 134 - 137)

CONFIDENTIAL

Page 138

1    A.   Again, if you're an executive in this
2  company, you're deemed to be financially astute and
3  understand policies.  So I don't see it as anything
4  different than the individual responsibility.  It's
5  as simple as picking up a phone and calling --
6  calling the office and asking, you know, can I sell
7  options.
8    Q.   So is there anything on this face of this
9  e-mail that indicates that an individual selling a
10 non-qualified stock option must seek pre-clearance?
11    A.   It's -- It's a piece of stock.  It goes --
12 If you want my interpretation it says that --
13    Q.   No, I've asked you --
14    A.   -- if you were going to sell the stock,
15 it's part of a -- it's the same as under the policy
16 of selling any stock.
17    Q.   So there's nothing in this e-mail, would
18 you agree, that tells an individual selling a
19 non-qualified stock that he or she must seek
20 pre-clearance?
21    A.   I -- I would have to read it a few times
22 to dissect any sort of meaning like that.
23    Q.   Okay.  Would you take a moment to read it,
24 please, and then answer my question.

Page 139

1       Have you had an opportunity to --
2    A.   No, I -- Yes.  Yeah, I mean, what I take
3  from this is an explanation of what an option is.
4    Q.   Okay.  Is there anything in the face of
5  this e-mail that indicates that an individual selling
6  a non-qualified stock option must seek pre-clearance?
7    A.   There's nothing on this document.  That's
8  not what the document was made to -- The document was
9  written to educate people on what a stock option is.
10    Q.   Okay.  And do you note the date of the
11 document?
12    A.   2019, March 7.
13    Q.   I'm sorry.  Could you -- Is that the date
14 that the e-mail was sent or is that the e-mail -- the
15 date that is in the subject of the e-mail?
16    A.   Well, it says subject, so I don't know
17 when the e-mail was sent.
18    Q.   Okay.  Well, can you look at the line
19 above the subject and see that it is, in fact, sent
20 on March 4, 2019?
21    A.   Okay.  I see that it was sent on March 4,
22 2019.
23    Q.   Okay.  Do you know when Cathy Henry sold
24 Chefs' Warehouse's stock?

Page 140

1    A.   No, I do not.
2    Q.   Mr. Pappas, can you see what I have now
3  posted on the screen as Exhibit No. 7?
4    A.   I can see it.
5    Q.   Okay.  I will start at the top and give
6  you an opportunity to review it.
7       Have you had an opportunity to review
8  Exhibit No. 7?
9    A.   Yes, I have.
10    Q.   What does it appear to be?
11    A.   I'm sorry?
12    Q.   What does Exhibit 7 appear to be?
13    A.   It's a note from the CFO explaining it's
14 tax season, and just a note about Restricted Stock
15 and stock options.
16    Q.   And is there anything in this e-mail that
17 tells an employee selling a non-qualified stock that
18 he or she must seek pre-clearance?
19    A.   No.  But it doesn't say not to follow the
20 company's policies and this is something that's
21 exempt or -- that there would be a change in any of
22 our policies.  The intent of the note was just to,
23 you know, to bring to people's attention, I guess,
24 just about the Restricted Stock and stock options.

Page 141

1  It's not a policy note.
2    Q.   And what's the date on that?
3    A.   Monday, March 4th.
4    Q.   Is that the same date, do you recall, as
5  the Lecouras e-mail of Exhibit -- that was Exhibit
6  No. 6?
7    A.   I believe so.
8    Q.   I'm going to go back, if I may.  Okay.
9  I'm back to Exhibit No. 6.  And I just wanted to be
10 clear.  Can you please review the one, two, three --
11 third paragraph of Exhibit No. 6 that begins with the
12 words, The price.
13       Do you see that the last sentence of --
14 I'm sorry -- the middle sentence of this paragraph
15 where I put the cursor indicate that "Employees will
16 have a deadline to exercise options, known as the
17 expiration date"?
18    A.   I see that.
19    Q.   So then this e-mail, as you've previously
20 testified, was sent March of 2019, correct?
21    A.   Correct.
22    Q.   And the Leddy e-mail that is Exhibit 7 is
23 likewise sent March 4, 2019?
24    A.   Correct.

36 (Pages 138 - 141)

CONFIDENTIAL

Page 142

1    Q.   And did Pat O'Callaghan tell you that at
2  Cathy Henry's termination meeting she referred to
3  receiving two e-mails the week that she sold her --
4  sold her stock?
5    A.   I don't recall.
6    Q.   Did Pat Lecouras tell you that at Cathy
7  Henry's termination meeting she said she had received
8  an e-mail that told her that she would lose her stock
9  options if she didn't exercise them?
10    A.   I don't recall.  But they're 10-year
11  options.  They have 10 years to redeem them.  So
12  that's kind of confusing to me.
13    Q.   So did Pat Lecouras tell you that Cathy
14  Henry had a mistaken belief that her stock options
15  would expire if she didn't exercise them?
16    A.   I don't recall.  But I go back to
17  everybody can pick up the phone.  It's only 20 people
18  and -- There's just no excuse for not picking up the
19  phone if you don't understand something, especially
20  when you know how important it is.
21    Q.   You have talked about the seriousness of
22  the policy that Cathy Henry violated.
23        As the CEO of Chefs' Warehouse, is it your
24  expectation that employees who violate company policy

Page 143

1  will be terminated?
2    A.   I expect policies to be followed.  As any
3  company there's a tremendous amount of employees and
4  policies.  The serious policies for executives who
5  are well compensated and receive stock are more
6  scrutinized than obviously somebody of a less
7  important role.
8    Q.   What kind of role would you consider an
9  important executive to follow company policies?
10  Besides the -- the 20 people that we've talked about
11  here, are there other individuals that you think it's
12  especially important for them to follow company
13  policies?
14    MR. LOOBY:  Objection to form.
15  BY THE WITNESS:
16    A.   We depend on day-to-day managers to manage
17  their businesses.  And obviously we try to follow
18  best practices.  So people unfortunately at certain
19  times are terminated for, you know, bad behavior.
20  But it's not something that, you know, we're seeking
21  out to terminate good employees.  Obviously it's hard
22  to find good employees, so we try to hold on to them,
23  incentivize them, so -- I'm sure there's -- I'm sure
24  there's things that get done that -- you know, under

Page 144

1  the radar -- under the radar of managers.
2  BY MS. HENRY:
3    Q.   You said earlier that Chefs' Warehouse is
4  in the people business.
5        What did you mean by that?
6    A.   We have a tremendous amount of employees
7  and -- You know, we're -- We're merchants, so --
8  We're in the fulfillment business, and we're only as
9  good as the last person towing the line.  So we
10  depend on our people to perform every day.  You know,
11  we're not into robotics and automation and we're not
12  in the software business.  We are -- We depend on a
13  tremendous amount of people to get the job done every
14  day.
15    Q.   Is it fair to say that customer
16  relationships are important Chefs' Warehouse?
17    A.   Of course.
18    Q.   And when you say that you're in the people
19  business and you depend upon people to get your work
20  done, if you learned that an employee was engaged in
21  behavior that was causing customers to complain,
22  would you expect that that employee's conduct would
23  be addressed?
24    MR. LOOBY:  Objection to form.

Page 145

1  BY THE WITNESS:
2    A.   Yeah, of course.  Certain situations where
3  maybe they're, you know, shorthanded and trying to
4  look for a replacement.  You know, I always say a
5  truck doesn't drive itself.  Sometimes they have to
6  hold on to employees a little longer than they would
7  like because they're shorthanded.  Perfect example,
8  the truck doesn't drive itself.  So -- But we do
9  expect eventually those employees are terminated.
10  BY MS. HENRY:
11    Q.   So on the topic of trucks not driving
12  themselves.
13        Who is Bob McKee?
14    A.   I don't know.
15    Q.   Who is the Transportation Manager at Allen
16  Brothers?
17    A.   Don't know.
18    Q.   Do you recall an incident where multiple
19  vehicles were involved in a serious accident with an
20  Allen Brothers truck?
21    A.   I don't.
22    MR. LOOBY:  Objection to form.  Is there a time
23  period?
24    MS. HENRY:  Let's see if he recalls an incident

37 (Pages 142 - 145)

CONFIDENTIAL

Page 146

1 that I -- like the one I've described.
2 BY THE WITNESS:
3    A.   I -- I don't recall.  Unfortunately our
4 trucks do have accidents and it's not a good day.
5 But -- Unfortunately we do have accidents.
6    MS. HENRY:  Okay.
7 BY MS. HENRY:
8    Q.   Do you recall that in November of 2016 an
9 Allen Brothers truck was involved in an accident on
10 the Ohio feeder ramp in Chicago resulting in several
11 critical injuries?
12    A.   I don't recall.  We have over a thousand
13 vehicles on the road.
14    Q.   How many accidents would you estimate
15 Allen Brothers or Chefs' Warehouse or any of your
16 other affiliated companies' vehicles are involved in
17 every year?
18    A.   I'm sure our Safety Team could answer
19 that.  But to me every accident is horr -- horrible
20 and tragic.  Again, we do a tremendous of drive
21 safety.  We try to hire the best drivers.  And it's
22 just part of our business.  It's an unfortunate part
23 of our business.  I don't want to speculate.
24    Q.   So I asked you before if you know who Bob

Page 147

1 McKee is, and you said that you don't know.
2    A.   I don't know.
3    Q.   Is that right?
4    A.   Yes.
5    Q.   Is this the first time you've ever heard
6 that name?
7    A.   I'm not sure.  But I cannot put a face to
8 the person or -- Again, I don't want to sound
9 flippant.  We have, you know, thousands of employees.
10 It's impossible for me to know, you know, these
11 employees.
12    Q.   Did you ever learn that a Transportation
13 Manager at Allen Brothers had not been keeping
14 Department of Transportation safety records?
15    A.   No, I don't know.
16    Q.   Do you recall learning that the
17 Director -- the Transportation Manager at Allen
18 Brothers in Chicago had not been keeping maintenance
19 records on Allen Brothers' vehicles?
20    A.   No.  But what I do know is we -- we
21 changed just about the whole Management Team at Allen
22 Brothers.  When we bought Allen Brothers it was
23 losing money.  It was a company that came out of
24 distress.  And it took a lot to right size it and

Page 148

1 turn it into a properly run profitable company.  And
2 there was many, many changes made.
3    Q.   Are you aware of any allegations regarding
4 drivers during the MT integration relying on fake
5 drug tests -- fake urine to pass drug tests?
6    A.   I don't recall.
7    Q.   Do you know who Steve Sheridan is?
8    A.   Yes, I do.
9    Q.   Who is he?
10    A.   He's in our -- He's in our Operations
11 Department.
12    Q.   Did Steve Sheridan ever report to you
13 that --
14    A.   He doesn't report to me.
15    Q.   Do you never speak to Steve Sheridan?
16    A.   Very rarely.
17    Q.   To whom would -- Who would be responsible
18 for reporting safety and security violations to you?
19    MR. LOOBY:  I'm going to object to the form.
20 I'm also going to object to this line of questioning
21 as going astray of what we discussed yesterday with
22 the Court.  I'll allow the witness to answer that.
23 But I would like to move on from this shortly.
24    You can answer the question.

Page 149

1 BY THE WITNESS:
2    A.   Yeah, that would go to -- We do have a
3 safety -- We have a Safety Department.  We have
4 transportation leaderships.  So there's -- We're in
5 the transportation business and warehousing, so we
6 do -- we do have leadership, and that's where -- You
7 know, complaints would go to that department.
8 BY MS. HENRY:
9    Q.   And who leads that department?
10    A.   I think we've had changes.  It used to all
11 go up into Ellie Thomas.  So today's structure, I
12 think it goes into two departments.  Part of it goes
13 into the regionals, and part would go to -- I think
14 there has been a change in operational leadership.
15 So it would go to that Operation leader who right now
16 the name is not coming to me.
17    Q.   So when you say regional leadership or MT
18 or Chefs' Warehouse or Allen Brothers, would that be
19 Pat O'Callaghan?
20    A.   Oh, back in the -- Back in that time frame
21 of Allen Brothers, Allen Brothers reports to Protein,
22 you know, which is where it belongs.  And during the
23 tenure of when we bought it and when it was
24 distressed, we had many managers trying to assist

38 (Pages 146 - 149)

CONFIDENTIAL

Page 150

1 bring the company into the 22nd Century.
2     Q.   At the time of the MT acquisition, who was
3 responsible for safety in Operations over MT in
4 Chefs' Warehouse Midwest?
5     MR. LOOBY: I'm going to object again on the
6 relevance to this line of questioning. We're really
7 getting beyond where we should be. I'll let the
8 witness answer this. But I'm putting you on notice
9 that we need to stay on target as the Court directed
10 yesterday.
11 BY THE WITNESS:
12     A.   I don't recall. But during any transition
13 or acquisition OR computer integration or new
14 facility, many managers participate, so -- I'm going
15 to assume it was the Head of Ops working with Protein
16 and working with the M&A Team and the local team. So
17 many people involved.
18 BY MS. HENRY:
19     Q.   So who would the head of Operations had
20 been at that time?
21     A.   Probably Ellie Thomas.
22     Q.   Do you know the name Joe Palero
23 (phonetic)?
24     A.   No.

Page 151

1     Q.   You've never heard of a HR manager at
2 Chefs' Warehouse and Allen Brothers in Chicago named
3 Joe Palero?
4     A.   What's the title?
5     MR. LOOBY: Objection. Asked and answered.
6 BY THE WITNESS:
7     A.   What's his title?
8 BY MS. HENRY:
9     Q.   Human Resources Manager?
10     A.   No.
11     Q.   Chefs' Warehouse Chicago and Allen
12 Brothers Chicago?
13     A.   They would report in to a regional, I
14 guess, HR person, would report in to Operations, I
15 guess. There must be a hundred people in that
16 department.
17     Q.   Does an HR Manager at Chefs' Warehouse
18 Chicago report to Pat Lecouras?
19     A.   HR Managers report -- Again, I think it's
20 dotted lines. They've changed that structure a few
21 times. So -- There's been times they reported, I
22 think, regionally. Overall they do report up to HR
23 which reports up to Pat Lecouras.
24     Q.   Is it your expectation that as Head of

Page 152

1 Human Resources Pat Lecouras would enforce Chefs'
2 Warehouse and Allen Brothers human resource policies?
3     A.   She would do her best.
4     Q.   Do you think that it would be appropriate
5 for the Vice President for Human Resources or the
6 Head of Human Resources professionals to violate
7 Chefs' Warehouse attendance policies?
8     A.   You broke up. I don't think I understand
9 the question.
10     Q.   Do you think it would be appropriate for
11 the Head of HR to permit Human Resources
12 professionals to violate Chefs' Warehouse attendance
13 policies by going absent without leave?
14     MR. LOOBY: Objection to the form.
15 BY THE WITNESS:
16     A.   I mean, I'd be speculating. Obviously we
17 hold people to professionalism and, you know, to do
18 their job professionally.
19 BY MS. HENRY:
20     Q.   Are you familiar with the name John Koris
21 (phonetic)?
22     A.   John Koris?
23     Q.   Yes.
24     A.   Yes, I am.

Page 153

1     Q.   What do you know about John Koris?
2     A.   He came -- He was an employee of the
3 company that we acquired, MT.
4     Q.   Is he still employed by Chefs' Warehouse?
5     A.   I -- No. I believe he is not.
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

39 (Pages 150 - 153)

CONFIDENTIAL

Page 154

Page 156

10    Q.    Do you know who John Koris reported to?
11    A.    I'd be speculating.  But I -- I would
12 assume he reported to people in -- in the Illinois --
13 He was based in Illinois.  He would report to them.
14    Q.    Do you know roughly when he was
15 terminated?
16    A.    No.
17    Q.    Would Cathy Henry, when she was in her
18 role as Regional Vice President, be in a superior
19 position to recommend the -- recommend the
20 termination of the employment of a sales
21 representative, like John Koris, to Pat O'Callaghan,
22 the Regional Vice -- or the Executive Vice President?
23    MR. LOOBY:  Can you say that again.  It cut out.
24 I want to make sure we have the question.

Page 155

Page 157

1    MS. HENRY:  Sure.
2 BY MS. HENRY:
3    Q.    Would Cathy Henry have been in a superior
4 position to recommend the termination of the
5 employment of a sales rep to the Executive Vice
6 President, Pat O'Callaghan?
7    MR. LOOBY:  Objection to form.
8 BY THE WITNESS:
9    A.    I'm going to -- I mean, you're asking me
10 to speculate.  They worked as a team.  I don't know
11 how long that they worked together.  But I'm going to
12 speculate they worked as a team to make decisions as
13 best they could for the betterment of the company.
14 BY MS. HENRY:
15    Q.    So I was asking you structurally who would
16 have the superior authority or position in making
17 decisions about a sales rep's employment, a Regional
18 Vice President, like Cathy Henry, or the Executive
19 Vice President for the Northeast, like Pat
20 O'Callaghan?
21    A.    Usually the Sales Manager would terminate
22 a salesperson.  So going above that, we're going
23 into, you know, unchartered waters in -- in our
24 structure.  So I don't know why a Sales Manager would

40 (Pages 154 - 157)

CONFIDENTIAL

Page 158

1 not be firing a salesperson.
2    Q.   Did you ever learn that Cathy Henry raised
3 concerns about fairness in pricing?
4       MR. LOOBY:  Objection to form and the relevance
5 of this question.
6 BY THE WITNESS:
7    A.   I don't recall.
8 BY MS. HENRY:
9    Q.   Who is Tara Brennan?
10    A.   An ex-employee.
11    Q.   And what was her -- How -- When did she
12 leave Chefs' Warehouse?
13    A.   I'm speculating.  A few years ago.
14    Q.   What was her title when she was there?
15    A.   I don't know.
16    Q.   How do you know she's an ex-employee?
17    A.   I know.
18    Q.   Who is John DeBenedetti?
19    A.   An ex-employee.
20    Q.   How long has he been an ex-employee?
21    A.   Four years.  Five years.
22    Q.   What was his title?
23    A.   I think Vice President of Protein.
24    Q.   Do -- Did Cathy Henry raise concern about

Page 159

1 John DeBenedetti, his role as Vice President of
2 Protein, giving Tara Brennan favorable pricing
3 alternatives for her customers?
4    A.   I don't recall.
5
6
7
8
9
10
11
12
13
14
15
16    Q.   When was he terminated?
17    A.   I think five years ago.
18    Q.   Was he terminated before or after Tara
19 Brennan was terminated?
20    A.   I don't recall.
21    Q.   Who is Pat Ansboury?
22    A.   An ex-employee.
23    Q.   What was his title -- When did he become
24 an ex-employee?

Page 160

1    A.   Don't recall.
2    Q.   Do you know if it was before or after
3 Cathy Henry was terminated?
4    A.   I don't recall.
5    Q.   What was his title?
6    A.   I don't recall.
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 161

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23 BY MS. HENRY:
24    Q.   Who would his superior officer have been?

41 (Pages 158 - 161)

CONFIDENTIAL



Page 162

1    A.   Again, at the -- We've had many changes
2  building that team, so I don't want to speculate.
3    Q.   What team is that?
4    A.   Protein.
5    Q.   Who is the Head of Protein now?
6    A.   It's run by -- It's run by our Seafood
7  Division Leader, Josh Berman, and by Harris Heckelman
8  on the Meat side, with a dotted line in to the
9  Region.
10    Q.   And who's the -- With a dotted line in to
11  the Regional Vice President.
12         Who would that be?
13    A.   Of that region, it would be Pat
14  O'Callaghan.

Page 165

13    MS. HENRY:  Counsel, I'd like to take a 15 --
14  10-minute break and resume.
15    MR. LOOBY:  Okay.  Thank you.
16    THE VIDEOGRAPHER:  Going off the record.  Time
17  on the monitor, 2:15 p.m.
18         (WHEREUPON, WE WERE OFF THE
19         RECORD.)
20    THE VIDEOGRAPHER:  We're back on the record.
21  Time on the monitor, 2:31 p.m.
22  BY MS. HENRY:

42 (Pages 162 - 165)

CONFIDENTIAL

Page 166

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 168

1　THE VIDEOGRAPHER: Going off the record. Time
2　on the monitor, 2:35 p.m.
3　　　　(WHEREUPON, WE WERE OFF THE
4　　　　RECORD.)
5　THE VIDEOGRAPHER: We're back on the record.
6　Time on the monitor, 2:38 p.m.
7　MR. LOOBY: Thank you.
8　　　We don't have any questions for the
9　witness at this time.
10　THE VIDEOGRAPHER: Okay. This concludes today's
11　testimony of Chris Pappas. The time on the monitor,
12　2:38 p.m. We're off the record.
13　　　　(WHEREUPON, WE WERE OFF THE
14　　　　RECORD AT 2:38 P.M.)
15　*　*　*　*　*　*　*　*　*
16
17
18
19
20
21
22
23
24

Page 167

1
2
3
4
5
6
7
8
9
10
11
12　BY MS. HENRY:
13　Q.　Did Chefs' Warehouse have an obligation to
14　back its Regional Vice President, Cathy Henry?
15　A.　Chefs' Warehouse works with all their
16　leadership to do the best job we can for -- for what
17　we do to produce business. I mean, we're in the
18　business of selling merchandise, so we are -- we
19　are -- yes, we are backing our leaders and trying to
20　support them to do the best job as long as they're
21　fit to -- to do the job.
22　MS. HENRY: I have no further questions.
23　MR. LOOBY: Could we take a 5-minute break?
24　MS. HENRY: Sure.

Page 169

1　　　　CERTIFICATE
2　　　　OF
3　　CERTIFIED SHORTHAND REPORTER
4
5　　I, Trudy G. Gordon, a Certified Shorthand
6　Reporter of the State of Illinois, CSR License
7　No.084-004077, do hereby certify:
8　　That previous to the commencement of the
9　examination of the aforesaid witness, the witness was
10　duly sworn to testify the whole truth concerning the
11　matters herein;
12　　That the foregoing deposition transcript
13　was stenographically reported by me and was
14　thereafter reduced to typewriting under my personal
15　direction and constitutes a true and accurate record
16　of the testimony given and the proceedings had at the
17　aforesaid deposition;
18　　That the said deposition was taken before me
19　at the time and place specified;
20　　That I am not a relative or employee or
21　attorney or counsel for any of the parties herein;
22　nor a relative or employee of such attorney or
23　counsel for any of the parties hereto, nor am I
24　interested directly or indirectly in the outcome of

43 (Pages 166 - 169)

CONFIDENTIAL

Page 170

```
1   this action.
2        IN WITNESS WHEREOF, I do hereunto set my
3   hand at Chicago, Illinois, this 6th day of August,
4   2021.
5
6
7
8
9             TRUDY G. GORDON, CSR
10
            CSR. License No. 084-004077
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

Page 171

```
1              Veritext Legal Solutions
                  1100 Superior Ave
2                    Suite 1820
                 Cleveland, Ohio 44114
3               Phone: 216-523-1313
4
    August 6, 2021
5
    To: Mr. Looby
6
    Case Name: Henry, Catherine v. Chef's Warehouse/ Allen Brothers
7
    Veritext Reference Number: 4707154
8
    Witness: Christopher Pappas       Deposition Date:  7/15/2021
9
10  Dear Sir/Madam:
11
        Enclosed please find a deposition transcript.  Please have the witness
12
    review the transcript and note any changes or corrections on the
13
    included errata sheet, indicating the page, line number, change, and
14
    the reason for the change.  Have the witness' signature notarized and
15
    forward the completed page(s) back to us at the Production address
16  shown
17  above, or email to production-midwest@veritext.com.
18
    If the errata is not returned within thirty days of your receipt of
19
    this letter, the reading and signing will be deemed waived.
20
21  Sincerely,
22  Production Department
23
24  NO NOTARY REQUIRED IN CA
```

Page 172

```
1            DEPOSITION REVIEW
          CERTIFICATION OF WITNESS
2
      ASSIGNMENT REFERENCE NO: 4707154
3     CASE NAME: Henry, Catherine v. Chef's Warehouse/ Allen Brothers
      DATE OF DEPOSITION: 7/15/2021
4     WITNESS' NAME: Christopher Pappas
5     In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
     I have made no changes to the testimony
7  as transcribed by the court reporter.
8
9  Date           Christopher Pappas
10     Sworn to and subscribed before me, a
   Notary Public in and for the State and County,
11  the referenced witness did personally appear
   and acknowledge that:
12
       They have read the transcript;
13     They signed the foregoing Sworn
          Statement; and
14     Their execution of this Statement is of
          their free act and deed.
15
       I have affixed my name and official seal
16
   this _____ day of_____, 20____.
17
18     Notary Public
19
       Commission Expiration Date
20
21
22
23
24
25
```

Page 173

```
1            DEPOSITION REVIEW
          CERTIFICATION OF WITNESS
2
      ASSIGNMENT REFERENCE NO: 4707154
3     CASE NAME: Henry, Catherine v. Chef's Warehouse/ Allen Brothers
      DATE OF DEPOSITION: 7/15/2021
4     WITNESS' NAME: Christopher Pappas
5     In accordance with the Rules of Civil
   Procedure, I have read the entire transcript of
6  my testimony or it has been read to me.
7     I have listed my changes on the attached
      Errata Sheet, listing page and line numbers as
8  well as the reason(s) for the change(s).
9     I request that these changes be entered
   as part of the record of my testimony.
10
       I have executed the Errata Sheet, as well
11  as this Certificate, and request and authorize
      that both be appended to the transcript of my
12  testimony and be incorporated therein.
13
   Date           Christopher Pappas
14
       Sworn to and subscribed before me, a
15  Notary Public in and for the State and County,
      the referenced witness did personally appear
16  and acknowledge that:
17     They have read the transcript;
       They have listed all of their corrections
18        in the appended Errata Sheet;
       They signed the foregoing Sworn
19        Statement; and
       Their execution of this Statement is of
20        their free act and deed.
21     I have affixed my name and official seal
   this _____ day of_____, 20____.
22
23     Notary Public
24
       Commission Expiration Date
25
```

44 (Pages 170 - 173)

CONFIDENTIAL

Page 174

```
1           ERRATA SHEET
        VERITEXT LEGAL SOLUTIONS MIDWEST
2           ASSIGNMENT NO: 4707154
3   PAGE/LINE(S) /      CHANGE      /REASON
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19
    _____    _____
20  Date         Christopher Pappas
21  SUBSCRIBED AND SWORN TO BEFORE ME THIS _____
22  DAY OF _____, 20_____ .
23  _____
        Notary Public
24
    _____
25      Commission Expiration Date
```

Veritext Legal Solutions
www.veritext.com                                       888-391-3376

1  READ/SIGN DEPOSITION OF:   Christopher Pappas
   DATE OF DEPOSITION:   7/15/2021
2  IN THE MATTER OF:   Henry, Catherine v. Chef's Warehouse/ Allen Brothers

3       DO NOT WRITE ON THE DEPOSITION ITSELF

4  Page Line  Changes or corrections and reason

5  95:8              "bills" should be "builds"              Wrong word

                     "I would that a executive" should be
6  95:14             "I would assume that an executive       Two missing words

7  122:1             "precedence" should be "precedent"      Wrong word

8  136:20            "no" should be "know"                   Wrong word

9  143:2             "As any" should be "As at any"          Missing word

10 _____

11 _____

12 _____

13 _____

14 _____

15 _____

16 _____

17 _____

18 _____

19 _____

20 _____

21 _____

22 I have inspected and read my deposition and
   have listed all changes and corrections above
23 along with my reason therefor.

24 DATE: 9/7/2021   SIGNATURE: _____